**MEMBERS OF the JAMESTOWN SCHOOL COMMITTEE et al.**

v.

**Dr. Thomas C. SCHMIDT et al.**

**Civ. A. No. 76–552.**

United States District Court,
D. Rhode Island.

March 8, 1977.

Amato A. DeLuca, Warwick, R. I., for plaintiffs.

Gregory L. Benik, Special Asst. Atty. Gen., Providence, R. I., Vincent J. Naccarato, Westerly, R. I., Joseph E. Marran, Jr., Pawtucket, R. I., Thomas W. Pearlman, Providence, R. I., Arnold E. Johnson, Cranston, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

### I

Plaintiffs seek declaratory and injunctive relief against Section 16–21–2 of the Rhode Island General Laws, contending that it violates the Establishment Clause of the First Amendment insofar as it provides transportation benefits to children attending sectarian schools which are not available to children attending public schools. For the reasons stated herein, the Court finds and declares that § 16–21–2 violates the Establishment Clause.

■ Plaintiffs, who bring this action individually,[1] are the five members of the Jamestown School Committee, the seven members of the Charlestown School Committee, and a resident of Jamestown with two children presently attending the Jamestown Elementary School. Each of the plaintiffs is a taxpaying resident of either Jamestown or Charlestown. Plaintiffs therefore have standing to challenge state expenditures as violative of the Establishment Clause. *DiCenso v. Robinson*, 316 F.Supp. 112, 114 n.1 (D.R.I.1970) (three-judge court), *aff'd sub nom. Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *See also Committee for Public Education v. Nyquist*, 413 U.S. 756, 762, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).

■ Jurisdiction over the various defendant state officials is founded on 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) for a cause of action arising under 42 U.S.C. § 1983.[2]

1. The Court therefore does not decide whether the school committees would themselves have the capacity under Rhode Island law to bring this suit.

2. The Court has granted the unopposed motions of a number of parents seeking intervention. Most of these defendant-intervenors have requested transportation for their children to sectarian schools pursuant to R.I.G.L. § 16–21–2 (1976), and have successfully appealed the adverse decisions of the Jamestown and Charlestown School Committees to the Commissioner of Education.

The contentions of one group of defendant-intervenors that the action should be dismissed for failure to join the school committees and the towns as indispensable parties can be summarily rejected. The committees and towns are neither indispensable nor necessary parties under Rule 19, F.R.Civ.P. The other issues raised by intervenors Port and Smith are similarly without merit.

The matter is now before the Court for final determination.[3]

## II

Based on a hearing and an agreed statement of facts, the Court makes the following findings of fact. Nearly 89% of the children attending Rhode Island's non-public schools actually attend sectarian schools, operated by religious bodies and providing, in part, religious education. From facts developed here and in *DiCenso v. Robinson, supra*, of which the Court takes judicial notice, it appears that there has long been a serious financial crisis in parochial education in this state. This crisis has led to the closing of some parish schools and their replacement by regionalized religious schools, which have cut down the costs of sectarian education through centralization and economies of scale. Regionalization has also enabled the Diocese of Providence, which operates almost all of the Catholic schools throughout Rhode Island, to provide better educational programs, broader curricula, and more efficient use of teachers in its schools.

Transportation of children to sectarian schools has long been an issue of wide dispute in Rhode Island. After the Supreme Court of Rhode Island ruled in 1965 that a former version of R.I.G.L. § 16–21–2 did not require school committees to provide transportation for children to private and sectarian schools outside the committee's local district, *Chaves v. School Committee*, 211 A.2d 639 (R.I.1965), the legislature rewrote the statute to require school committees which bussed children to public schools to bus local children to any public, private, or sectarian school in the state which had "regionalized", that is, declared itself open to children in a specific area within the state. The Rhode Island Supreme Court struck down that statute as well, holding that the statute impermissibly delegated

---

3. After a hearing on the preliminary injunction spanning two days, the Court by letter requested each party to state whether it wished further trial on the merits, or was satisfied that the matter be consolidated and finally disposed of pursuant to F.R.Civ.P. 65(a)(2). *See* 7 Moore Federal Practice par. 65.04[4]. The only "objection" to consolidation came from one intervenor-defendant, who did not request further trial, but presented the Court with an offer of proof, detailing what each of four witnesses would testify to if further trial on the merits were held. Much of the offer of proof had been the subject of extensive testimony at the hearing.

The Court has proceeded to final judgment because, taking each fact therein as true in the light most favorable to the defendants, plaintiffs are still entitled to judgment as a matter of law. The offer of proof is as follows:

*First Offer Of Proof:*

Mr. Stanley M. Jendzejec, Pupil Transportation Safety Administrator of the State of Rhode Island would testify to the following pertinent information:

1. Bus Transportation with a 15 mile radius of a regional school is reasonable and necessary for the safety and welfare for School Children.

2. Public School students who attend Vocational and Regional Schools are being similarly bussed.

3. Bus transportation is being similarly provided over distances exceeding 15 miles for public students to such special education schools as the Meeting Street School and School of the Deaf.

4. Bus transportation for children who have to travel more than a mile to school safeguards their health, safety and welfare because higher frequencies of accidents and sickness occur to students who walk, hitchhike, bicycle or otherwise travel long distances including more frequent colds, illness and missing meals.

*Second Offer Of Proof:*

5. That Dr. William Robinson that in exercising his discretion to approve or disapprove bus transportation requests to a school claimed to be a regional school uses reasonable criteria and standards such as accredation (sic) of the school; legitimacy of the establishment of the school as a regional school, and the reasonableness and necessity of all factors.

*Third Offer Of Proof:*

6. Through an expert in Municipal and Town Finance to prove that bussing would not jeopardize other educational programs and money could be found from other programs and/or by raising extra funds in Jamestown and Charlestown.

*Fourth Offer Of Proof:*

7. That an educational expert would testify that educationally regardless of religion that such bussing makes more sense in that the child benefits health, welfare and educational standards benefit when they have a regular safe transportation to school, and further that this issue in no way concerns the relationship between church and state.

legislative power to the private and sectarian schools. *Jennings v. Exeter-West Greenwich Regional School District Committee*, 352 A.2d 634 (R.I.1976).[4]

The legislature has now responded again, attempting to provide transportation for children attending non-public schools within constitutional limits. The statute at issue here, R.I.G.L. § 16–21–2, passed in 1976, provides:

*Transportation of school pupils without town limits.*—In the event that any such public or private schools are consolidated, regionalized, or otherwise established to serve residents of a specific area within the state, the school committee of any town shall provide such transportation for pupils attending said schools who reside within the town and within the area served by such school notwithstanding the location of the school without the limits of the town if the pupils reside so far from the school that transportation to public school is provided within the town for other pupils who reside as far from school, provided that a town shall not be required to transport any pupil beyond an area having a (fifteen) 15 mile radius from the school building which such pupil attends.

In order to assess the constitutionality of the newly amended law, it is necessary to understand its practical operation with respect to the regionalized Catholic schools. Parishes may be included in a regional district only with their consent and with the approval of the Diocese. After a parent requests transportation from a local school committee, the school committee normally requests an opinion from the Commissioner of Education as to whether the school for which transportation is sought is in fact a "regional" school for which transportation must be provided. If the Commissioner is of the opinion that the school is in fact established to serve residents of a specific area, he issues a written opinion so stating, although this opinion is of no legal force or effect. Should the local school committee refuse to provide requested transportation to a regionalized school, the parents may appeal that decision to the Commissioner of Education, who then issues a formal Decision stating whether or not the school committee has a duty to provide the requested transportation. A Decision of the Commissioner may be appealed to the Board of Regents, and then by writ of certiorari to the Rhode Island Supreme Court.

The Commissioner has recently issued two Decisions determining that the Jamestown and Charlestown School Committees have a duty to bus the children of intervenor-defendants to the Monsignor Matthew F. Clarke Regional School which is located outside of their respective towns but within fifteen miles of the Jamestown and Charlestown town limits.[5] These decisions were issued on appeal of rulings of the Jamestown and Charlestown School Committees declining to provide the requested transportation on the grounds that providing such transportation would be contrary to the Establishment Clause of the First Amendment. After the Commissioner's ad-

---

4. Under the former version of § 16–21–2 struck down in *Jennings*, there was no limit on the size of the area a regional school could decide on its own motion to serve, and local school committees were obligated to transport their children to any regional school in the state serving their area. The Rhode Island Supreme Court noted that this would impose massive bussing costs on local school committees, over which they would have no control. For example, a school committee in Westerly would have been required to bus a child so wishing to a regional sectarian school in Providence. *Jennings v. Exeter-West Greenwich Regional School District Committee*, 352 A.2d 634 (R.I. 1976).

5. The parties stipulated that the Monsignor Clarke School, as well as other regional schools operated by the Diocese of Providence, contain identifying religious symbols, and provide religious instruction, as set forth in *DiCenso v. Robinson*, 316 F.Supp. 112, 116–18 (D.R.I.1970) (three-judge court), *aff'd sub nom Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Monsignor Clarke Regional School was created by an Act of the legislature in 1967. The Act allows the regional school corporation "to serve such regions within the State of Rhode Island as the Corporation may from time to time determine . . ."

verse decisions, individual members of each committee sought injunctive and declaratory relief in this Court. Examination of the transportation provided various groups of school children in Rhode Island demonstrates that § 16–21–2 does not in practice, as it purports to, provide transportation benefits to public and sectarian school children alike.

Public school children enrolled in the standard curriculum comprise the great majority of children enrolled in schools of Rhode Island. Transportation must be provided for such children by the local school committees only within the local school districts,[6] or to the public school designated for the children of a community which does not operate its own school.

Besides occasional athletic and educational field trips, there are only two groups of public school children bussed outside of their school districts. Neither of these groups is bussed pursuant to R.I.G.L. § 16–21–2.

First, the state has established a system of nine regional vocational schools throughout the state. Each regional vocational school (hereinafter RVS) serves the city or town within which it is located as well as the other cities and/or towns located within the designated region. Each city or town has a limited number of spaces which it may fill with its students at the RVS serving it. A local school committee is obligated to transport these pupils to the RVS; and the school committee is also obligated to provide transportation for a pupil seeking to enroll in a vocational program offered at a RVS other than the one serving his region. Approximately 4864 students in grades 10–12 attend regional vocational schools, of whom 1559 are bussed out of their own communities. Since this transportation was provided by local school committees well before the enactment of § 16–21–2, and since local school committees transport some children to regional vocational schools well past the fifteen mile limit of transportation provided pursuant to § 16–21–2, it is apparent, and the Court so finds, that transportation of pupils to RVS's is provided pursuant to power vested in the Board of Regents by Title 16, Chapter 45 of the Rhode Island General Laws, and not under any authority conferred by § 16–21–2.

Second, R.I.G.L. § 16–24–4 requires local school committees to provide transportation for children requiring special education programs which are not provided in the local school district. This transportation is provided at the option of the school committee, not at the option of the parent.

The evidence showed, therefore, that R.I.G.L. § 16–21–2 will in fact benefit a single class of children: those attending private schools, the vast majority of which are sectarian. Contrary to the contentions of the defendants, § 16–21–2 does not in practice authorize transportation of children to special education classes or to vocational schools. The evidence also showed that the cost of providing transportation for children attending the Monsignor Clarke School will far exceed the normal cost of school transportation. In Jamestown, the average bussing cost per student per year to public school is $126.26. The least expensive cost of providing the requested transportation to the Monsignor Clarke School would be $401.24.[7] Since the Jamestown School budget has recently been cut back, and was

---

6. Thus, although children in Jamestown live within 15 miles of the Newport Regional School, the Jamestown School Committee is not obligated under R.I.G.L. § 16–21–2 to bus children to the Newport Regional School. Children in the standard curriculum are bussed across town lines to attend school only where the public school designated for their attendance is in another town. For instance, the Jamestown School Committee operates no high school, and transports all of its children in the standard high school curriculum to North Kingstown, with which the Jamestown School Committee contracts for educational services.

7. The Court heard extensive testimony regarding the Jamestown and Charlestown School budgets, and each Committee's investigations of alternative methods of providing the requested transportation to the regional school. The conclusions of each committee, accepted here, were not seriously disputed by the defendants. The comparable cost of transporting a Jamestown child to special educational programs or to a RVS is $300. *But see* text following n.6 *supra*.

described by the School Committee Chairwoman as "barebones", the increased costs necessitated by providing the requested transportation would result either in elimination of the few services not "locked-into" the budget, e. g., library supplies and audio visual services, or increased school taxes.

Charlestown faces a similar dilemma. Only $2,240.20 of the school budget of $596,-365 is unencumbered by unbreakable commitments. While the average cost of transporting a child to Charlestown Elementary School is $110.00 per pupil per year, the cost of providing requested transportation to the Clarke School would be $1950 per pupil per year.

### III

#### A. Comity

Defendants contend that the Court must abstain because the Commissioner's determination of the school committee's responsibilities is on appeal to the Board of Regents, citing *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975).

██ The Court disagrees. *Huffman* makes clear that the policies which the comity doctrine seeks to vindicate are implicated only when federal courts interfere with state *judicial* proceedings. *Huffman v. Pursue, Ltd.*, supra, at 604, 95 S.Ct. 1200. *See also Gibson v. Berryhill*, 411 U.S. 564, 574 n.13, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Anonymous v. Association of the Bar of the City of New York*, 515 F.2d 427, 433–34 (2nd Cir. 1975); *Rite Aid Corp. v. Board of Pharmacy of New Jersey*, 421 F.Supp. 1161, 1179 (D.N.J.1976) (three-judge court) (Stern, J., concurring on this point). There are no pending state judicial proceedings here. There may never be, since review of the Board of Regents' ultimate decision is discretionary with the Rhode Island Supreme Court. *See Slattery v. School Committee of Cranston*, 354 A.2d 741 (R.I.1976). The question presented here does not arise in the criminal or quasi-crimi-

nal context which is the necessary predicate for abstention, *Huffman v. Pursue, Ltd.*, supra, 420 U.S. at 604, 95 S.Ct. 1200. *See also Rite Aid Corp. v. Board of Pharmacy of New Jersey*, supra, at 1166–68 (majority opinion). If this Court were required to abstain whenever a state law implicating a state interest was challenged, then it would have to abstain in every case challenging state statutes brought pursuant to 42 U.S.C. § 1983. Such exhaustion of state remedies has never been, and is not, required. *See Huffman v. Pursue, Ltd.*, supra, 420 U.S. at 592 n.21, 95 S.Ct. 1200; *Gibson v. Berryhill*, supra; *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Bowen v. Hackett*, 361 F.Supp. 854, 890 (D.R.I.1973).

This case presents the question of whether or not a state statute violates rights secured by the United States Constitution. Over a hundred years ago Congress authorized the federal courts to decide such questions. *See Mitchum v. Foster*, 407 U.S. 225, 238–242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). The frivolous nature of defendants' *Younger-Huffman* arguments is demonstrated by a look at the long list of suits similar to this one, challenging in federal courts state expenditures under laws claimed to violate the Establishment Clause. *See, e. g., Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975). Plaintiffs have chosen a federal forum, and have a right to have the issue decided in a forum of their choice.

#### B. Justiciability and Ripeness

Because the school committees have not in fact expended any funds for transportation pursuant to § 16-21-2, defendants suggest that the case is not ripe for adjudication.

██ Article III of the United States Constitution requires that parties seeking relief in the courts demonstrate a "personal stake

in the outcome". *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Rodos v. Michaelson*, 527 F.2d 582 (1st Cir. 1975). Parties must be able to assert that they are immediately in danger of sustaining a direct injury, *Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), and that the action complained of is sufficiently final so that the constitutional question involved will be decided in the context of a concrete case, not a mere hypothetical injury *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 154, 71 S.Ct. 624, 95 L.Ed. 817 (Frankfurter, J., concurring) (1951).

For the reasons detailed below, the Court concludes that the present case satisfies all the requirements of Article III.

First, it seems clear that the Commissioner's formal decisions, overturning the refusals of the school committees to provide the transportation requested pursuant to § 16–21–2 are sufficiently final under *Joint Anti-Fascist Committee v. McGrath, supra*. All the parties agree that the only issues before the Board of Regents on appeal of the Commissioner's decisions are the constitutional issues presented here. The Board of Regents is incompetent to decide those constitutional questions. See *Altman v. School Committee of Town of Scituate*, 347 A.2d 37 (R.I.1975). *Cf. Allen v. Rhode Island Board of Veterinarians*, 72 R.I. 372, 52 A.2d 131 (1947) (lower courts may not decide constitutional questions in the absence of explicit legislative authorization.) The Court has not found any Rhode Island case even remotely suggesting that the Board may decide the constitutional questions before it. The Commissioner's decisions are plainly the state's "final" word, unless the questions at issue here are later presented to the Rhode Island Supreme Court by writ of certiorari.

Second, contrary to defendants' contentions, the school committees need not be embroiled in enforcement proceedings to render this case sufficiently "concrete" to satisfy Article III. Plaintiffs are not challenging a law which *may* be applied to them, or attempting to secure relief against hypothetical or speculative harm. Nor are they challenging a mere opinion of the Commissioner of no legal force or effect. Section 16–21–2 *has been* applied to them in the particularized and concrete manner required by Article III. Both the Commissioner and the Board of Regents have recently strongly affirmed the proposition that a decision by the Commissioner is of binding effect, and must be followed, absent a stay (which has not been granted here). In *Hulecki v. School Committee of the Town of Glocester* (Commissioner of Education, June 1, 1976), the Commissioner sharply reprimanded a school committee which had failed to follow his decision reversing their own earlier determination in the matter. The Board of Regents agreed, stating, "since no stay was granted to the Commissioner's orders of February 17, 1976, it seems to us that the reinstatement order should have been complied with by the School Committee". *Id.* (Board of Regents, October 7, 1976), at 1.

This case is in sharp contrast to *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), where married plaintiffs were seeking a declaration of unconstitutionality against a 64 year old state statute prohibiting the use of contraceptive devices. The state had never enforced the statute and thus the Court concluded that the controversy lacked the immediacy "which is an indispensable condition of constitutional adjudication" even though enforcement measures existed. The statute had not been enforced since the nineteenth century, and the plaintiffs shared their grievance, hypothetical as it was, with all couples and doctors in the state. Here, on the other hand, plaintiffs rely on far more than the mere existence of available enforcement measures.[8] The school committees have recently been placed under a direct order of the Commissioner. To remove themselves from

---

8. A wide variety of enforcement measures are available to the defendants. The Commissioner has a duty "to require the observance of all laws relating to schools and education . . ." R.I.G.L. § 16–1–5. The Board of Regents has a similar duty, R.I.G.L. § 16–49–4(9)(g), and may

the burden of that order which they consider unconstitutional, they proceeded immediately to seek relief in this Court. Whether or not this situation presents the immediate threat of irreparable harm sufficient to support injunctive relief, it presents the prototypical controversy in which a grant of declaratory relief would meet Article III requirements.

Similarly, the apprehension of plaintiffs here that their taxes will be used in violation of the Establishment Clause has a realistic basis which was found lacking in *Rodos v. Michaelson*, 527 F.2d 582 (1st Cir. 1975). As Judge Aldrich said in *Rodos*:

> It may well be that valid fear of prosecution need not be measured in terms of total reasonableness, or with cold detachment. Nonetheless, it cannot be purely speculative; there must be something to weigh.

*Id.* at 585. Here, in light of *Hulecki, supra*, and the wide variety of enforcement measures available to various defendants, the Commissioner's Decision weighs heavily indeed. Issue has been joined between these parties. Because the Commissioner has found that the school committee is under a present duty to provide the requested transportation, plaintiffs have a justiciable complaint against the statute pursuant to which that duty arises.

### IV

■ In assessing plaintiffs' claim that the challenged statute is an act "respecting an establishment of religion", the Court is bound by familiar principles of First Amendment jurisprudence. Primary among the objectives protected by the Es-

tablishment Clause is the maintenance of a wall keeping the sovereign from sponsorship, financial support, or active involvement with religious activity. *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Lemon v. Kurtzman*, 403 U.S. 602, (1971); *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

The case most firmly on point is *Everson*, where the Supreme Court upheld against Establishment Clause challenge a New Jersey statute authorizing transportation of children to private and sectarian schools along established school routes. Justice Black's opinion for a bare majority reasoned that the provision of transportation equally to public and private school children constituted a general program of public welfare benefits available to all pupils. The Court upheld such programs, analogizing them to the provision of police services to all citizens, regardless of religious belief, and of fire-protection for all community buildings, including churches. Justice Black found that the New Jersey scheme in *Everson* met the required First Amendment test of neutrality, although he noted that it approached the "verge" of constitutionality. *Id.* at 16, 67 S.Ct. 504.[9]

■ In recent years, the Court has developed a three-part test to determine whether particular statutes violate the Establishment Clause.

---

enforce the Commissioner's decisions by withdrawing state funds from the schools. R.I.G.L. § 16–5–30. Because the school committees are infringing private rights of parents not held in common with other citizens similarly situated, the intervenor-defendants are entitled to a writ of mandamus against the Commissioner to compel him to perform the ministerial act of requiring observance of his decision. *Demers v. Shehab*, 101 R.I. 417, 224 A.2d 380, cert. denied 386 U.S. 966, 87 S.Ct. 1047, 18 L.Ed.2d 116 (1967). The intervenor-defendants may also seek a writ of mandamus directly against

the school committees. *See Sun Oil Co. v. Macauley*, 72 R.I. 206, 49 A.2d 917 (1946).

**9.** The Supreme Court has continued to adhere to Justice Black's acknowledgement that *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) was a borderline case, representing perhaps the farthest reach of state aid in this sensitive area. *See Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."

403 U.S. at 612–13, 91 S.Ct. at 2111 (citations omitted).

For purposes of this case, the Court accepts the proposition that the purpose of § 16–21–2 is the neutral purpose of providing for the safe transportation of all children to school.[10]

■ Analysis of the primary or principal effect of the challenged statute, however, discloses a primary effect impermissible under *Everson* and its progeny.

Prior to the passage of § 16–21–2, school committees were obligated to provide the same transportation options to all children, regardless of the schools they attended. For the great majority of children attending neither vocational nor special education classes, transportation was provided within the school district, either to public or sectarian schools. This was fully consistent with the Supreme Court's teaching in *Everson, supra.* Section 16–21–2, however, places on school committees—on taxpayers—the requirement that they provide an additional option to children attending out-of district non-public (i. e., sectarian) schools. This option is not provided to public school children.

Section 16–21–2 is therefore not a law, like the statute upheld in *Everson,* which provides equal benefits to all school children. As the evidence showed, the Jamestown school committee will have to spend three times more for transportation of local children to the Monsignor Clarke School than it would pay for their transportation to the public school. The Charlestown school committee will pay eighteen times more for transportation of children to the Monsignor Clarke School than it would pay for transportation to public school.

■ A statute substantially similar to § 16–21–2 was struck down in *Americans United for Separation of Church and State v. Benton,* 413 F.Supp. 955 (D.Iowa 1975) (three-judge court). There the court stated:

the legislation before us in the instant case does not reflect the policy of "benevolent neutrality" required for constitutional validation. *Walz v. Tax Comm'n, supra,* 397 U.S. at 669, 90 S.Ct. at 1411, 25 L.Ed.2d at 701. This is not a general benefit legislative scheme such as was involved in *Everson, Allen* and *Walz.* In this case nonpublic school children are being afforded benefits that are not available to public school students. Thus, the state aid involved here is flowing to a special class composed primarily of sectarian elementary and secondary schools which are an integral part of the religious mission of the churches which support them. This differential treatment "inescapably results in the direct and substantial advancement of religious activity" and thus is unconstitutional.

413 F.Supp. 959–960 (footnote omitted). The *Benton* court also found it immaterial that the funds at issue were provided directly to the nonpublic students rather than to the schools, a conclusion with which this Court agrees:

We do not believe that the fact that this aid in the form of transportation goes only to the nonpublic students and not to the schools themselves renders it immune from Establishment Clause consideration. In *Nyquist* the Supreme Court invalidated a tuition reimbursement and tax credit program directed at parents of children attending nonpublic schools. Regardless of whether those dollars reimbursed or credited to the parents ever

---

**10.** For the years 1971–1975, Rhode Island averaged 2.22 deaths per 100 million miles driven by all vehicles, and 0.09 deaths per 100 million miles driven by school busses. Without statistics on the safety of walking to school, it is hard to know whether § 16–21–2 has succeeded as a safety measure. According to the offer of proof, *see* n.3, *supra,* bussing children to school safeguards their health, safety, and welfare.

found their way to the nonpublic schools, that money "represents a charge made upon the state for the purpose of religious education." *Nyquist, supra,* 413 U.S. at 791, 93 S.Ct. at 2975, *quoting from Committee for Public Educ. and Religious Liberty v. Nyquist,* 350 F.Supp. 655, 675 (S.D.N.Y.1972) (Hays, J., dissenting). Likewise, the money spent in Iowa for the transportation of nonpublic school students across district lines is a charge upon all taxpayers which benefits nonpublic schools by lessening their overall expenses and by necessitating the construction and maintenance of fewer schools. The absence of any direct payments to these schools is immaterial. 413 F.Supp. at 960.

Here, as in *Benton,* the benefits provided by the challenged statute fail to meet the requirement announced in *Everson* and every succeeding Establishment Clause case in the Supreme Court—that benefits be provided in common, substantially equally, without distinctions between children attending sectarian and public schools. *See, e. g., Roemer v. Board of Public Works of Maryland, supra,* 426 U.S. at 745–746, 96 S.Ct. 2337; *Public Funds for Public Schools v. Marburger,* 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974), *aff'g mem.* 358 F.Supp. 29 (D.N.J.1973) (three-judge court); *Meek v. Pittenger, supra,* 421 U.S. at 362, n.12, 95 S.Ct. 1753; *Sloan v. Lemon,* 413 U.S. 825, 832, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973).[11]

The infirmity of § 16–21–2 is therefore not that any transportation of pupils to religious schools inevitably "aids" those schools. *Everson* long ago decided that aid analogous to the even-handed provision of municipal services is a form of "benevolent neutrality", inescapable if religious institutions and individuals are not to be discriminated against in violation of the Free Exercise Clause. *Roemer v. Board of Public Works of Maryland, supra,* 426 U.S. at 746–747, 96 S.Ct. 2337; *Meek v. Pittenger, supra,* 421 U.S. at 364–65, 95 S.Ct. 1753; *Walz v. Tax Commission, supra,* 397 U.S. at 664, 90 S.Ct. 1409. Section 16–21–2 is infirm because *in fact* it affords greater options—greater benefits—to children attending the quickly increasing number of regionalized religious schools than to children attending public schools. It has the effect *in fact* of transferring a major cost of regionalization from parents seeking to provide their children a religious education, and the religious bodies themselves, to the taxpayers of the state. This the legislature may not do. *Committee for Public Education v. Nyquist, supra* ; *Sloan v. Lemon, supra* ; *Americans United for Separation of Church and State v. Benton, supra.*

It is no answer that § 16–21–2, on its face, requires local school committees to bus children to any regional school, public or private, within a fifteen mile radius of the school district. Scrutiny of state laws under the Establishment Clause has never

11. Defendants urge the Court to look to the benefits received by public and sectarian school children, rather than the cost of providing those benefits. Under their view, § 16–21–2 provides equal benefits—transportation to and from school—and the differing cost of providing that transportation for sectarian school children should be disregarded. The Court assumes that the Establishment Clause can countenance differing costs of transportation provided within a school district. For instance, because of economies of scale, it may cost the school committee of Providence less to bus a child to a Providence public school than to a sectarian school in the city. However, § 16–21–2 in practice expands only the area in which children attending private (sectarian) schools are transported. Its effect is therefore impermissible under the *Lemon v. Kurtzman* test, *supra.*

Although the parents are free to send their children to private schools, under the First Amendment the state may not assist them in that endeavor. In *Committee for Public Education v. Nyquist, supra,* Chief Justice Burger (dissenting in part) suggested that New York's proposed system of tuition grants passed *Everson* muster because it provided parents of children in religious schools with comparable benefits to those already enjoyed by parents of public school children. The Court rejected that argument, *noting that religious school parents already* enjoyed equal rights by virtue of their right to send their children to public schools. The law upheld in *Everson, supra,* did not require New Jersey to set up any additional bus routes; it provided children attending religious schools places on established public school bus routes.

proceeded by blindly nodding approval to labels placed on aid schemes. Where, as here, the effect of those schemes is inescapably to aid sectarian schools, they will be struck down. *Committee for Public Education v. Nyquist, supra,* 413 U.S. at 786, 93 S.Ct. 2955; *Meek v. Pittenger, supra,* 421 U.S. at 364–365, 95 S.Ct. 1753; *Sloan v. Lemon, supra,* 413 U.S. at 832, 93 S.Ct. 2982.

The fact is that children in Jamestown and Charlestown are presently permitted under § 16–21–2 to avail themselves of bussing at the expense of local school committees to sectarian schools to far greater distances, and at far greater public expense, than if they sought bussing to public schools already designated for their attendance. Nor are there regionalized public schools within a fifteen mile radius of Jamestown and Charlestown which will accept students from those communities dissatisfied with their designated schools. The fact that there might be some day is of little consolation to parents of public school children who must now subsidize extra benefits for children attending sectarian schools at a time when local school committees are hard-pressed to meet the educational needs of children in public schools.

The Court also finds that plaintiffs have succeeded under the third part of the *Lemon* test by demonstrating the entanglement of church and state brought about by § 16–21–2.

In general, the Supreme Court has favored plans allocating neutral aid on a single occasion, *Tilton v. Richardson,* 403 U.S. 672, 679, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) and has disfavored plans involving "successive and very likely permanent annual appropriations that benefit relatively few religious groups", *Lemon v. Kurtzman, supra,* 403 U.S. at 623, 91 S.Ct. at 2116. The challenged statute, which falls into the latter category, will entangle church and state in two ways. First, because § 16–21–2 clearly permits a single town to be included in the region served by a number of regionalized schools, § 16–21–2 will necessitate a great increase in the amount of coordination between school districts, the state, and sectarian school authorities to determine the amount of money available for transportation, the number of busses required, routes, holidays, and so forth. Second, and of greater importance, § 16–21–2 will inevitably

> provides successive opportunities for political fragmentation and division along religious lines, one of the principal evils against which the Establishment Clause was intended to protect.

*Meek v. Pittenger, supra,* 421 U.S. at 372, 95 S.Ct. at 1767. *See also Lemon v. Kurtzman, supra,* 403 U.S. at 622–23, 91 S.Ct. 2105. The funding of cross-district sectarian education is already a political issue in Jamestown. Parents of children denied transportation by the Jamestown School Committee have appeared at numerous school committee meetings, speaking out strongly in opposition to the Committee's Establishment Clause-based refusal to provide transportation. It is worth observing that nearly all of the plaintiffs in this case are elected school board members—and their positions regarding the cross-district transportation of children to sectarian schools can hardly fail to be a major issue at the next school committee elections.

## V

Plaintiffs have requested both injunctive and declaratory relief. In accordance with this memorandum, plaintiffs are entitled to a declaration that § 16–21–2 is unconstitutional to the extent that it requires cross-district transportation of nonpublic school students.

The request for injunctive relief stands on a different footing. The parties are in strong disagreement over whether or not plaintiffs have satisfied the requirement of irreparable harm. *See Palmigiano v. Travisono,* 317 F.Supp. 776 (D.R.I.1970). On the one hand, the defendants point out that the Jamestown and Charlestown school committees are not presently transporting children to the Monsignor Clarke School, and are therefore not expending any of plaintiffs' funds pursuant to § 16–21–2. On the other

hand, plaintiffs point to the particularized decision of the Commissioner of Education regarding the present duty of the school committees to provide the requested transportation. They argue that this decision, in light of *Hulecki v. School Committee of Town of Glocester, supra,* constitutes the required imminent threat of irreparable harm. The Court notes that any funds expended by the school committees could in all likelihood never be recouped. *See Lemon v. Kurtzman,* 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973).

█ The Court regards the question of irreparable harm under the circumstances presented here as especially close and difficult to resolve. Because there is no indication that the defendant state officials would not abide by the law as declared by this Court, the Court believes it to be the wiser course to decline in the exercise of its discretion to grant the requested injunctive relief.

The plaintiffs will present to the Court within ten days an order for prospective declaratory relief, endorsed as to form by defendants.