**CROMWELL PROPERTY OWNERS ASSOCIATION, INC., et al.**

v.

**John E. TOFFOLON et al.**

Civ. No. H–78–475.

United States District Court, D. Connecticut.

Aug. 31, 1979.

Martha Stone, Conn. Civil Liberties Union Foundation, Paul W. Orth, Hartford, Conn., for plaintiffs.

Robert W. Garvey, Asst. Atty. Gen., Thomas B. Mooney, Richard N. Palmer, Shipman & Goodwin, Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

NEWMAN, Circuit Judge.*

This case involves a challenge to the constitutionality of Connecticut Public Act 78–278, Conn.Gen.Stat. § 10–280a (1979 Supp.), which became effective July 1, 1978. Entitled "An Act Concerning the Transportation for Nonpublic School Children," P.A. 78–278(a) authorizes any regional or local board of education to provide transportation for school children residing within the school district to non–public, non–profit elementary and secondary schools located in contiguous school districts and (b) provides state reimbursement to the local or regional boards for one–half of the cost of supplying such transportation up to specified aggregate and per pupil dollar limits.[1]

---

\* Of the United States Court of Appeals for the Second·Circuit, sitting by designation. At the time the matter was submitted for decision, Judge Newman was a District Judge of the United States District Court for the District of Connecticut.

1. P.A. 78–278 provides:
 Be it enacted by the Senate and House of Representatives in General Assembly convened:
 Section 1. (NEW) Any local or regional board of education may provide transportation to a student attending an elementary or secondary non–public school, not conducted for profit and approved by the state board of education, outside the school district wherein such student resides with a parent or guardian, provided that no grant shall be provided for any costs incurred by such board for transportation beyond a contiguous school district, and provided further that such elementary or secondary non–public school is located within the state of Connecticut. Upon application to the state board of education, any local or regional board of education which so provides such transportation shall annually receive from the state an amount equal to one–half of the total costs to the local or regional board of such transportation, provided the maximum amount appropriated by the state in any fiscal year, for the purposes of this act, shall not exceed one hundred fifty thousand dollars and provided the state shall not pay more than an average of thirty–five dollars per pupil so transported, prorated on the basis of the ratio of the number of students which such local or regional board so transports to the total number of students so transported in the state.
 Section 2. The sum of one hundred fifty thousand dollars is appropriated to the department of education, for the fiscal year ending June 30, 1979, from the sum appropriated to the finance advisory committee under section 1 of special act 78–17 for 1978 acts without appropriations, for the purpose of this act.
 Section 3. This act shall take effect July 1, 1978.

██ Plaintiffs, an incorporated association of Cromwell homeowners and an individual taxpayer living in Cromwell, brought this action under 42 U.S.C. § 1983 against the Connecticut State Board of Education, the Cromwell Board of Education, and officers and members of both boards. Plaintiffs allege that P.A. 78–278 violates the Establishment Clause of the First Amendment and the Equal Protection Clause of the Fourteenth.[2] They seek a declaratory judgment that the statute and defendants' policies and practices under the statute are unconstitutional, and a permanent injunction prohibiting implementation of the Act.

At the time that they filed their complaint, plaintiffs also moved for a preliminary injunction. In lieu of an evidentiary hearing, the parties have filed an extensive, detailed statement of stipulated facts and individual offers of proof on a few disputed issues. The parties understood that if the Court was satisfied that the statement of stipulated facts was sufficient to render judgment, a ruling on the merits would be consolidated with the motion for a preliminary injunction motion. Fed.R.Civ.P. 65(a)(2). That procedure is being followed.

The statement of stipulated facts establishes that a group of parents appeared before the Cromwell Board of Education at its regular meeting on July 11, 1978, and requested that the Board provide transportation to Cromwell school children who are students at Mercy and Xavier High Schools, both located in Middletown, a school district contiguous to Cromwell. In connection with this request, the parents submitted a list of approximately 96 students who would take advantage of such transportation and a cost estimate of $16,000 from Bourne, Inc., the company that currently provided all required bus service for Cromwell students. The Board voted unanimously to authorize the expenditure of funds from the 1978–79 budget for such a transportation program. The Board members acted pursuant to P.A. 78–278 "because they wished to provide the same transportation to students attending non–profit, non–public schools in contiguous towns as is provided to students attending the Cromwell public schools. One of the motivating factors in the Board's decision was concern for the safety of all students." Stipulation, ¶ 56.

After the board meeting, defendant Paddyfote, Cromwell Superintendent of Schools, directed Bourne, Inc. to develop bus schedules for the transportation of the Mercy and Xavier High School students from Cromwell. Bourne's original contract with the Cromwell Board of Education was modified to reserve two additional buses for this purpose. Transportation for public and non–public school children began on September 6, 1978. During the 1978–79 school year, 118 students attending Mercy and Xavier High Schools received bus transportation from the Cromwell Board of Education.

Based on bills submitted by Bourne, Inc. for September to November, 1978, the approximate per pupil cost to the Town of Cromwell to provide inter–district transportation to Mercy and Xavier High Schools is $125.57 per year. This amount is $60.67 more than the average annual per pupil cost for intra–district bussing to Cromwell's

2. Plaintiffs' equal protection claim is totally without merit. In essence, plaintiffs argue that P.A. 78–278 and the resolutions of the Cromwell Board of Education unconstitutionally discriminate against children attending schools within their residential districts and in favor of children attending schools outside their residential districts, the latter group limited to non–public, non–profit schools. The interest in inter–district transportation at state expense does not rise to the level of a fundamental right; therefore, the legislative scheme need only further some legitimate, articulated state purpose in order to satisfy the requirements of equal protection. As discussed *infra*, the legislative history of P.A. 78–278 reflects a concern for the safety of children attending non–public, non–profit schools outside the town of their residence, as well as for the financial burden that the public school system may be forced to bear if significant numbers of private school children turned to public education. Since these State interests are legitimate, *see Committee for Public Education v. Nyquist,* 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973), and the Act and related resolutions rationally further these goals, the Equal Protection Clause has not been violated.

public schools, but $14.25 less than the average annual per pupil cost for publicly funded transportation to out–of–district vocational and technical schools. Pursuant to P.A. 78–278, the Cromwell Board of Education can seek reimbursement through the Connecticut State Board of Education for the expense of bussing Cromwell students to Mercy and Xavier High Schools, at an amount not exceeding $35.00 per pupil per year. Cromwell Board of Education intends to seek this reimbursement from the State.

Mercy and Xavier High Schools are affiliated with the Roman Catholic Church and provide, in part, religious education. The schools admit both Catholic and non–Catholic students. As of October 1, 1978, 10% of the students at Mercy and 12.1% of the Xavier students were non–Catholic. Of the 64 Cromwell students attending Mercy, 13 are non–Catholic (20.3%), and of the 63 Cromwell students attending Xavier, 15 are non–Catholic (23.8%). The majority of the faculty at both schools are members of the laity, and some are non–Catholic. Catholic students at these schools must attend classes in theology and religious doctrine.

There is no Roman Catholic high school within the Cromwell school district. In fact, Mercy and Xavier are the only Roman Catholic high schools in Middlesex County. Admission to the schools is not limited to students residing in any particular geographic area, but is open to any student within Connecticut who wishes to attend and can meet the entrance requirements. In the 1978–79 school year, 64% of the Mercy and Xavier students resided outside Middletown and approximately 29% resided outside Middlesex County.

Plaintiffs argue that P.A. 78–278 and the Cromwell Board's resolutions are at variance with the constitutional principles that ensure the separation of church and state. Using the tripartite test developed by the Supreme Court to evaluate legislation challenged under the Establishment Clause, plaintiffs contend that the statute and resolutions cannot pass muster under any of the three criteria.

■ The Supreme Court has held that for a statute to survive a challenge that it unconstitutionally authorizes state aid to religiously affiliated schools, it must have a secular legislative purpose, a principal or primary effect that neither advances nor inhibits religion, and must not foster an excessive governmental entanglement with religion. Originally formulated as a "purpose and effect" test in *Abington Township School District v. Schempp*, 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963), and *Board of Education v. Allen*, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968), the Supreme Court added the "entanglement" element in *Lemon v. Kurtzman*, 403 U.S. 602, 624, 91 S.Ct. 2105, 2116, 29 L.Ed.2d 745 (1971). The three–pronged analysis has been employed consistently since *Lemon*. See *Committee for Public Education v. Nyquist*, 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973); *Meek v. Pittenger*, 421 U.S. 349, 358, 95 S.Ct. 1753, 1759, 44 L.Ed.2d 217 (1975); *Wolman v. Walter*, 433 U.S. 229, 236, 97 S.Ct. 2593, 2599, 53 L.Ed.2d 714 (1978). The constitutionality of P.A. 78–278 must be assessed under this tripartite test.

P.A. 78–278 and the resolutions of the Cromwell Board of Education are adequately supported by legitimate, non–sectarian purposes. The Board's concern for the safety of non–public school children was recognized by the Supreme Court as reasonable and of a clearly secular nature in *Everson v. Board of Education*, 330 U.S. 1, 7, 67 S.Ct. 504, 507, 91 L.Ed. 711 (1947), the seminal decision on public bussing of non–public school pupils. Furthermore, "the State's interest in promoting pluralism and diversity among its public and nonpublic schools," *Committee for Public Education v. Nyquist, supra*, 413 U.S. at 773, 93 S.Ct. at 2966, and the interest in alleviating the "already overburdened public school system that might suffer in the event that a significant percentage of children presently attending nonpublic schools should abandon those schools in favor of the public schools," *ibid.*, have been sanctioned as constitutionally sufficient secular purposes. The legislative

history of P.A. 78–278 indicates that the Connecticut General Assembly considered these purposes as major reasons for enactment.[3]

This case presents issues of a thornier nature under the second element of the tripartite test: whether the statute's "primary effect" evinces a standard of "neutrality" that neither advances nor inhibits religion. Plaintiffs attack the neutrality of P.A. 78–278 and the Cromwell Board's resolutions on three grounds. First, these measures allegedly give preferential treatment to Catholicism to the exclusion of other religions. Second, these measures allegedly create a special benefits program for a class composed mainly along sectarian lines. Finally, these measures allegedly furnish substantial financial aid to sectarian schools. This Court concludes that plaintiffs have failed to prove an "advancement" of religion under the particular facts of this case.

█ Clearly, a demonstration that most of the beneficiaries of Connecticut's inter–district transportation program will be members of one religious sect is not constitutionally significant. For the sake of argument, this Court will accept plaintiffs' contention that only the Roman Catholic Church operates the type of primary and secondary school "network" throughout the State that will gain advantage from public bussing to contiguous towns. Even so, pertinent case law has not incorporated into the principle of religious neutrality any standard approaching equal dollar allotments for each group of religious adherents. In *Everson v. Board of Education, supra,* 330 U.S. at 4, n. 2, 67 S.Ct. at 505, it was uncontroverted that publicly funded bussing of non–public school children was currently provided solely to students attending Roman Catholic schools. That the Roman Catholic Church operates the bulk of non–public sectarian schools contiguous to the Cromwell school district and in Connecticut generally, and therefore more school children attending Catholic schools will benefit than students attending other religious schools, are as irrelevant here as such facts were in *Everson.* See also, *Wolman v. Walter, supra,* 433 U.S. at 234, 97 S.Ct. at 2598 (provision of non–religious textbooks, standardized testing and scoring services, diagnostic services, and therapeutic and remedial services upheld where "[m]ore than 96% of the nonpublic enrollment attended sectarian schools, and more than 92% attended Catholic schools"). There is no claim that the State law or Cromwell's implementation of it contains any requirement that disqualifies students of any religious sect from eligibility.

█ Plaintiffs' second argument is that P.A. 78–278 creates a "special" benefits program, in that the Act (a) provides the distinct advantage of inter–district transportation (b) to a single class, those elementary and secondary school children attending non–public, non–profit institutions. Because the Act does not furnish the same opportunity to children attending public schools or schools operated for profit, the legislation's "primary effect" is allegedly to advance education at non–public, non–profit schools, most of which, plaintiffs implicitly contend, are sectarian. Neither branch of this second argument prevails.

---

3. During floor debates on P.A. 78–278, several Connecticut legislators indicated their support for the bill as a measure to enhance educational pluralism and economic conservatism. State Representative Eugene A. Migliaro stated: ". . . a lot of parents have been sending their students to non–public schools, and I think this is a small token of saying thanks to the non–public school systems . . . for taking a big burden off the back of many small towns." Conn.Gen. Assembly Proceedings, House 1978, Vol. 21, at 3671. State Senator Joseph J. Fauliso commented: "But it's about time we stepped up front and said thank you to these people that are choosing the private schools, that are giving competition to the public schools and it should be so because there is a decline in the quality of education in the public school system." Conn.Gen. Assembly Proceedings, Senate 1978, Vol. 21, at 1922. These statements, which plaintiffs understood to suggest the "blatantly sectarian" purposes behind P.A. 78–278, evidence the same secular ends approved in *Committee for Public Education v. Nyquist, supra.*

No special benefit is conferred upon non–public school children merely because the Act specifically authorizes bussing across district lines. District lines are not, in and of themselves, constitutionally significant. Delineation of school districts is simply the means by which the State arranges for the provision of public education. Because the responsibility for public education has been divided geographically into districts does not metaphysically transform bussing across district lines into a "special benefit" for non–public school children.[4]

Moreover, non–public school students who are bussed pursuant to P.A. 78–278 are not the only children who may receive transportation to out–of–district schools at the expense of the State. The Connecticut General Statutes contain numerous provisions authorizing inter–district transportation of both public and non–public school children in a variety of contexts.[5] More specifically, Conn.Gen.Stat. § 10–220 grants to local boards of education the power to arrange for the education of public school children in adjacent towns, and requires that "reasonable and desirable" transportation be furnished. Conn.Gen.Stat. § 10–76d provides inter–district public transportation to children attending public schools for special education. Similarly, Conn.Gen.Stat. § 10–97 mandates publicly funded transportation for public school children admitted to regional vocational technical schools or to out–of–district agricultural training schools. Conn.Gen.Stat. § 10–277 requires each local or regional school board that does not maintain a high school to transport students residing within the district to a high school approved by the State Board of Education. Finally, disadvantaged children who participate in programs authorized under Conn.Gen.Stat. § 10–266j are transported at public expense, even if the programs are conducted in school districts other than those in which the students reside.[6]

4. Consider the hypothetical case in which a public school and a parochial school are both located within the same school district. Later, the Connecticut Assembly redraws public school district lines, and an incidental effect of this redistricting is that the public school and the parochial school are now located in separate but contiguous school districts. The student who rides the same bus route to and from the parochial school cannot be said to receive any more "special" benefit after redistricting than he did before. The fact of inter–district bussing becomes relevant only when examining the substantiality of aid to sectarian schools, discussed infra.

5. One cannot conclude from the fact that P.A. 78–278 applies only to children attending out–of–district non–public non–profit schools that Connecticut law has created a special benefits program. It is not necessary that a "general welfare" program be codified in one statute. When examining Pennsylvania's secular textbook program in Meek v. Pittenger, supra, 421 U.S. at 360 n. 8, 95 S.Ct. at 1761, the Supreme Court noted:

Pennsylvania Stat.Ann., Tit. 24, § 8–801, requires that textbooks be provided free of charge for use in the Pennsylvania public schools. Act 195, Pa.Stat.Ann., Tit. 24, § 9–972, provides the authorization for the loan of textbooks to non–public elementary and secondary school students. So long as the textbook loan program includes all school–children, those in public as well as those in private schools, it is of no constitutional significance whether the general program is codified in one statute or two. See Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 782 n. 38, [93 S.Ct. 2955, 2970, 37 L.Ed.2d 948].

6. Pursuant to these statutes, Connecticut's regional and local boards of education have transported numerous students to schools outside of their respective districts. In the 1977–78 school year, 121 town school districts and 11 regional districts bussed a total of 5,724 children into other districts for vocational technical training at a cost of $289.15 per child. Stipulation, ¶ 13. In the same period, 84 town and 10 regional school districts provided inter–district transportation for 1,193 children to vocational agricultural programs at a cost of $455.74 per child. Stipulation ¶¶ 23 and 24. Twenty–one town school districts that are not members of a regional school district furnish transportation to out–of–district high schools. Stipulation, ¶ 18. During 1977–78, the Hartford Board of Education alone provided transportation to other town school districts for 1,138 socially, economically, or environmentally disadvantaged children who participated in a program entitled "Project Concern." Stipulation, ¶ 27. Other such disadvantaged children attending similar programs are bussed out of the Bridgeport and New Haven school districts to adjoining towns' districts. Stipulation, ¶ 28.

As of September, 1978, the Cromwell Board of Education provided inter–district transportation to 16 students enrolled in special education

Considering the legislative scheme as a whole, this Court cannot agree with the plaintiffs that P.A. 78–278 creates a totally new transportation service not previously available to any other Connecticut school children. Rather, the "benefit" in inter–district bussing conferred by the statute has been furnished to public school children under various circumstances. P.A. 78–278 and Cromwell's implementing resolution therefore conform to a permissible general benefits program.

Plaintiffs rely upon *Americans United for Church and State v. Benton*, 413 F.Supp. 955 (S.D.Iowa 1975), and *Members of the Jamestown School Committee v. Schmidt*, 427 F.Supp. 1338 (D.R.I.1977), for the proposition that inter–district bussing constitutes a "special" benefit. Both *Benton* and *Schmidt* are distinguishable from the present case, however. Because the Connecticut statutory scheme contemplates inter–district transportation for both public and non–public school students, it differs from the legislation held unconstitutional in *Benton*, which authorized inter–district transportation only for non–public school students after the Iowa State Board of Public Instruction had forbidden any inter–district bussing of public school children. Although the facts in *Schmidt* more closely resemble the context of this case, the Rhode Island District Court examined the challenged statute in isolation, rather than as part of a broader public welfare program, and found that the legislation did not furnish inter–district transportation to all school children alike.

To the extent that either *Benton* or *Schmidt* establishes that inter–district bussing is an inherently greater benefit than intra–district transportation, this Court declines to adopt their rationale. Far more persuasive is the reasoning of the Pennsylvania Supreme Court in *School District of Pittsburgh v. Pennsylvania Department of Education*, 483 Pa. 539, 397 A.2d 1154 (1979), *appeal dismissed for want of a substantial federal question*, 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979), upholding a statute that required public transportation for pupils attending public or non–public schools located within 10 miles of a school district's borders. The Court rejected the argument that inter–district bussing is a "special benefit" *per se*, stating:

> The statute requires that nonpublic school students receive transportation opportunities "identical" to those accorded public school students with the proviso that the district is not required to bus *any* student farther than ten miles from the district's borders. "Identical" in this context means that public and nonpublic school students must be bused *to their schools* if such schools are within the ten mile limit. School district boundaries are not sacrosanct; they are only flexible political lines drawn to accommodate the efficient administration of the educational system of this Commonwealth.

█ P.A. 78–278 withstands scrutiny under the third ground asserted by the plaintiffs for finding a primary religious effect, that the transportation program constitutes substantial aid to sectarian schools. Not only does the provision of inter-district bussing confer no direct dollar benefit to sectarian institutions, but the statute imposes budgetary restrictions that maintain any indirect advantage within constitutionally acceptable levels.

*Everson v. Board of Education, supra,* characterized public transportation of school children as a public welfare measure essentially devoid of religious significance. The direct benefit of the *Everson* bussing statute flowed to the non–public school chil-

---

programs, to 13 students attending the Woodrow Wilson Vocational Agricultural School in Middletown, to 69 students attending the Vinal Technical School in Middletown, and to 9 students participating in a career–based work-study program at the Portland High School. Cromwell offers to its eighth grade students the option of applying to the Vinal Technical or Wilson Agricultural schools as an alternative to public education within the district. Students are accepted on the basis of test scores and interviews with the schools' guidance counselors. Those who are accepted are transported to these school districts at the expense of the Cromwell Board. Stipulation, ¶ 36.

dren and their parents, and not to the sectarian institutions.[7] Since *Everson* and *Board of Education v. Allen, supra*, it is indisputable that the transportation program at issue does not create the direct "sponsorship, financial support, and active involvement of the sovereign in religious activity" that the "establishment" of a religion connotes. See *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970).

P.A. 78–278 may well confer an "indirect" or "incidental" benefit upon Connecticut's sectarian schools, however. Plaintiffs allege that, because of the continuing financial crisis confronting parochial education, parishes have consolidated their elementary and secondary educational enterprises.[8] Because the Act enables church schools to draw students from "long–distant" localities, it will encourage parishes to continue their efforts towards regionalization, thereby lessening overall expenses in constructing and maintaining many schools.[9]

■ The fact that inter–district bussing may secure such "incidental" benefits does not automatically render the statute and the Cromwell Board's resolution in violation of the Establishment Clause. Indeed, *Everson* recognized that public payment of bus fares was of some value to religious schools, since "children are helped to get to church schools" and "some of the children might not be sent to the church schools if the parents were compelled to pay their chil-

dren's bus fares out of their own pockets." 330 U.S. at 17, 67 S.Ct. at 512. These "indirect" benefits were, nevertheless, not such support of religious institutions as to constitute a prohibited establishment of religion.

At some point, the cost of inter–district transportation for students attending sectarian schools may become so grossly disproportionate compared to the ordinary expense of public school bussing that the "indirect" benefits in regionalization accruing to the sectarian institutions will rise to a constitutionally significant level. At such a point, it would become apparent that the transportation provided to the non-public school youngster was a mere ruse to confer a "direct" benefit on the church–affiliated school in allowing it to operate at all.

Case law in the area of religious establishment indicates that the point at which neutral state assistance translates into significant support of religion is difficult to locate. *Everson*'s non–public bussing scheme, which restricted state funded transportation of sectarian school students to established public school bus routes, 330 U.S. at 3 n. 1, 67 S.Ct. at 505 n. 1, involved minimal public outlay. Courts have not read *Everson* so narrowly as to hold that the Establishment Clause cannot countenance differing costs of transportation for public and sectarian school children within or outside a school district.[10] At the oppo-

---

**7.** The *Everson* opinion states:

The State contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools.

330 U.S. at 18, 67 S.Ct. at 513.

**8.** The parties agree that the number of elementary and secondary Catholic schools in Connecticut has decreased from 1968 to 1978. Stipulation, ¶ 108, and attached exhibit D. There have been ten mergers or consolidations of Catholic schools in Connecticut, six on the secondary school level and four on the elementary school level. Stipulation, ¶ 107. Testimony presented to the Connecticut General Assembly Joint Committee on Education with respect to P.A. 78–278 indicates that parochial

schools have merged in order to avoid mounting costs of operation. Stipulation, ¶ 109, and attached exhibits E–G.

**9.** Plaintiffs' contention that the immediate and primary effect of inter–district bussing is to "subsidize" the operations of sectarian schools has received support in scholarly commentary. *See, e. g., Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development Part II: The Nonestablishment Principle*, 81 Harv. L.R. 513, 529 (1968); Freund, *Public Aid to Parochial Schools*, 82 Harv.L.R. 1680, 1682 (1969).

**10.** The following state court cases relied on *Everson* to uphold intra–district or inter–district bussing schemes for non–public school children along routes other than the established public school routes: *Snyder v. Town of New-*

site extreme, *Meek v. Pittenger, supra,* found substantial aid to non–public schools in a statute that authorized almost twelve million dollars in auxiliary services, secular textbooks and instructional materials provided directly to the private schools themselves.

This Court finds that P.A. 78–278 and the bussing plan implemented by the Cromwell Board of Education do not earmark the massive amounts of state assistance to non–public school children that would render substantial indirect aid to sectarian schools. Two features of the statute operate as important safeguards. The Act places a ceiling upon the total state appropriation for inter–district transportation at $150,000 in any fiscal year. Second, the State will not reimburse any expenses for transportation beyond a contiguous school district. Clearly, the comparative per capita costs of bussing public school, parochial school and vocational school children within and outside of the Cromwell district, set out *supra,* demonstrate that the Cromwell Board has not diverted substantial assistance for the indirect benefit of Mercy or Xavier High Schools.

 Plaintiffs' position fares no better under the third and final part of the Supreme Court's tripartite analysis: excessive administrative and political entangle-

ments between church and state. Although the State Board of Education must approve the non–public schools to which residents are transported before a town is reimbursed for its inter–district bussing costs,[11] the approval process does not require the type of "comprehensive, discriminating and continuing state surveillance" found to create excessive administrative entanglement in *Lemon v. Kurtzman, supra,* 403 U.S. at 619, 91 S.Ct. at 2114, and *Wolman v. Walter, supra,* 433 U.S. at 254, 97 S.Ct. at 2608. Personal visitation and inspection of the non–public school and personal examination of its educational materials, see Stipulation ¶ 81, are examples of the "necessary and permissible contacts" demanded under compulsory school–attendance laws. See *Lemon v. Kurtzman, supra,* 403 U.S. at 614, 91 S.Ct. at 2112; *Board of Education v. Allen, supra,* 392 U.S. at 245–46 & n.7, 88 S.Ct. at 1927 & n.7.

Moreover, although the State Board of Education must receive notice of transportation contracts, the number of pupils transported, and proof of a non–public school's tax exempt status in order to process the grants, certification of this information comes directly from the local boards of education. Stipulation ¶ 82. P.A. 78–278 will not require annual state audits of sectarian school accounts, inventories, and rec-

ton, 147 Conn. 374, 161 A.2d 770, *appeal dismissed for want of a substantial federal question,* 365 U.S. 299, 81 S.Ct. 692, 5 L.Ed.2d 688 (1960); *West Morris Regional Bd. of Educ. v. Sills,* 58 N.J. 464, 279 A.2d 609, *cert. denied,* 404 U.S. 986, 92 S.Ct. 450, 30 L.Ed.2d 370 (1971) (challenged legislation provided transportation to "remote" non–profit non–public schools within 20 miles of pupil's residence "regardless of whether such transportation is along established public school routes," 58 N.J. 464, 279 A.2d at 611 n.2); *Rhoades v. School Dist.,* 424 Pa. 202, 226 A.2d 53 (1967), *appeal dismissed for want of a substantial federal question,* 389 U.S. 11, 88 S.Ct. 61, 19 L.Ed.2d 7 (1969); *School Dist. v. Pennsylvania Dept. of Educ.,* 483 Pa. 539, 397 A.2d 1154 (1979), *appeal dismissed for want of a substantial federal question,* 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979); *Honohan v. Holt,* 17 Ohio Misc. 57, 244 N.E.2d 537 (1968); *Alexander v. Bartlett,* 14 Mich.App. 177, 165 N.W.2d 445 (1968); *Americans United Inc. as Protestants v.*

*Independent School Dist. No. 622,* 288 Minn. 196, 179 N.W.2d 146 (1970); *State ex rel. Hughes v. Board of Educ.,* 174 S.E.2d 711 (W.Va.1970).

11. The State Board of Education began the preparation of a procedure to approve the educational standards of both public and non–public schools prior to the enactment of P.A. 78–278. Although the procedure was finalized on June 28, 1978, its preparation had no connection with passage of the inter–district bussing bill. In fact, Mercy and Xavier received accreditation under this procedure before P.A. 78–278 was enacted.

On or about September 1, 1978, a list of independent Connecticut schools approved for purposes of P.A. 78–278 was issued by the State Board. Both Mercy and Xavier were listed, and neither was contacted for approval by the State from the date of the bill's passage. *See* Stipulation, ¶ 80.

ords, as occurred in *Lemon v. Kurtzman, supra.*

The Cromwell bussing program itself has engendered virtually no administrative contacts between the Board of Education and the Mercy or Xavier authorities, much less the degree of entanglement that may be considered constitutionally suspect. The parents of children attending Mercy and Xavier prepared the list of students in need of transportation, and Cromwell's Superintendant of Schools merely submitted the list to Bourne, Inc., which developed appropriate bussing schedules. Stipulation, ¶¶ 55 and 66. As of January 12, 1979, the town and school authorities have had no further contact regarding the transportation program. Stipulation, ¶ 57. Plaintiffs present no reason to anticipate any greater degree of coordinated efforts than has already been experienced.

Plaintiffs' concerns as to political divisiveness are even less troubling. That appropriations for non–public school bussing must be approved annually will not necessarily aggravate the danger of political fragmentation along religious lines. See *Roemer v. Maryland Public Works Board,* 426 U.S. 736, 766, 96 S.Ct. 2337, 2354, 49 L.Ed.2d 179 (1976). Two characteristics of the public aid provided under P.A. 78–278 mitigate the potential for excessive political entanglement. First, voter confrontation on religious grounds is less likely where the amount of state assistance in issue will not be perceived as significant. The actual cost of the Cromwell program and the statutory ceiling on state subsidies for non–public school bussing do not begin to approximate the expenses authorized by the legislation invalidated in part on entanglement grounds in *Lemon v. Kurtzman, supra,* 403 U.S. at 610 and 622–24, 91 S.Ct. at 2110 and 2115–2116, and *Johnson v. Sanders,* 319 F.Supp. 421, 423 n.1 and 432.

Second, the prospect of political division based on religious affiliation is likely to be diminished where there is no substantial administrative entanglement. As this District observed in *Johnson v. Sanders, supra,* 319 F.Supp. at 432, a measure "featuring complex ongoing administrative relationships with [sectarian] institutions sets the stage for confrontations and conflicts such as the perpetuation of religious divisions within legislative bodies." The cases in which the Supreme Court has found excessive political entanglement have involved situations where the potential for administrative entanglement was also held to be constitutionally significant. See, e. g., *Lemon v. Kurtzman, supra,* 403 U.S. at 614–24, 91 S.Ct. at 2112–2116, and *Meek v. Pittenger, supra,* 421 U.S. at 372, 95 S.Ct. at 1766. Cf. *Roemer v. Maryland Public Works Board, supra,* 426 U.S. at 761–66, 96 S.Ct. at 2351–2354.

Courts have been hesitant to invalidate statutes solely on the basis of potential political entanglement. The Supreme Court warned in *Committee for Public Education v. Nyquist, supra,* 413 U.S. at 797–98, 93 S.Ct. at 2977–2978, that "the prospect of [seriously divisive political consequences] may not alone warrant the invalidation of state laws that otherwise survive the careful scrutiny required by the decisions of this Court . . . ." The present record substantiates at most only a possibility of political divisiveness in the future. The Cromwell bussing program was adopted by unanimous vote of the Board of Education on July 11, 1978, and no opposition to the transportation program has been expressed to the Board since that time. Stipulation, ¶¶ 56 and 58. Plaintiffs offer no basis to find a realistic potential for the degree of political entanglement that has rendered other statutes unconstitutional.

When the Supreme Court in 1947 by a 5 to 4 margin in *Everson* upheld use of public funds to bus school children to religious schools, it departed from a strict interpretation of the Establishment Clause that might otherwise have stood as a barrier to any public expenditure for the direct or indirect benefit of religious schools. When the Supreme Court this year in the *Pittsburgh* case ruled that the use of public funds to bus students to religious schools up to ten miles beyond the borders of their residential school district does not present a

substantial federal question, it applied a flexible interpretation of the Establishment Clause that provides ample authority for the Connecticut legislation challenged in this case. At least as applied to publicly funded transportation of students to Mercy and Xavier High Schools in Middletown from Cromwell, two contiguous towns whose combined land area is 56.4 square miles, P.A. 78–278 does not violate the Establishment Clause of the First Amendment.

Plaintiffs' motion for preliminary injunctive relief is therefore denied, and judgment shall enter declaring P.A. 78–278 constitutional as applied.