MEMBERS OF the JAMESTOWN
SCHOOL COMMITTEE, et al.,
Plaintiffs, Appellees,

v.

Dr. Thomas C. SCHMIDT, as Commission-
er of Education of the State of Rhode
Island, et al., Defendants, Appellants.

No. 82–1081.

United States Court of Appeals,
First Circuit.

Argued June 10, 1982.

Decided Jan. 19, 1983.

Rehearing Denied March 10, 1983.

Before COFFIN, Chief Judge, ROSENN *
and BREYER, Circuit Judges.

COFFIN, Chief Judge.

The issue in this case is whether a Rhode Island statute providing bus transportation to nonpublic school children beyond school district limits constitutes a "law respecting an establishment of religion" and is therefore invalid under the First and Fourteenth Amendments. Plaintiffs are several federal, state and local taxpayers and two organizations, the American Civil Liberties Union and Americans United for Separation of Church and State.[1] The district court, finding that the law provides sectarian school children with "greater options at greater public expense than their public school counterparts", and that administrative contacts to coordinate the program together with the risk of political division along religious lines created "an excessive entanglement of church and state", held the law unconstitutional. *Members of the Jamestown School Comm. v. Schmidt*, 525 F.Supp. 1045 (D.R.I.1981) (*Jamestown III*).

## I. *Litigation History*

The State of Rhode Island has struggled persistently but thus far unsuccessfully to extend the benefits of its school busing program to nonpublic students who attend nonprofit schools outside of their local school districts. As originally enacted, the busing statute stated that "[t]he school committee of any town shall provide suitable transportation to and from school for pupils attending public schools . . . who reside so far from any public school as to make their regular attendance at school impracticable . . . ." R.I.Gen.Laws § 16–21–1 (former version). A second provision

Daniel J. Schatz, Sp. Asst. Atty. Gen., Providence, R.I., with whom Dennis J. Roberts, II, Atty. Gen., Providence, R.I., was on brief, for defendants, appellants.

Amato A. DeLuca, Warwick, R.I., with whom Sandra A. Blanding and Revens & DeLuca, Ltd., Warwick, R.I., were on brief, for plaintiffs, appellees.

* Of the Third Circuit, sitting by designation.

1. Plaintiffs have standing as taxpayers to challenge a legislative enactment authorizing the expenditure of funds as violative of the Establishment Clause under the principles of *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). *See, e.g., DiCenso v. Robinson*, 316 F.Supp. 112, 114 n. 1 (D.R.I.1970) (three-judge court), *aff'd sub nom. Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Court recently reaffirmed the legitimacy of taxpayer standing under *Flast. See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 481–82, 102 S.Ct. 752, 763, 70 L.Ed.2d 700 (1982).

required such school committee to "provide for pupils attending private schools . . . the same rights and privileges as to transportation to and from schools as are provided for pupils attending public schools." § 16–21–2 (repealed).

The Rhode Island Supreme Court subsequently interpreted the statutory phrase "public schools" to apply only to public schools within a student's local school district; therefore, the court ruled that the provision requiring that private students be offered "the same rights and privileges" as public students did not authorize busing private students *beyond* local districts. *Chaves v. School Comm. of the Town of Middletown,* 100 R.I. 140, 211 A.2d 639 (1965). The statute was thereafter amended to require that public transportation be provided to students residing within an area served by any "public or private schools [which] are consolidated, regionalized, or otherwise established to serve residents of a specific area within the state . . . notwithstanding the location of the school without the limits of the town." Although this law authorized interdistrict busing, it provided no standards to limit or guide the discretion of private schools in expanding the size of the areas they would serve. The state Supreme Court therefore held that it constituted an impermissible delegation of legislative power to a private entity, and invalidated the law with respect to "regions" not in existence when the statute was enacted. *Jennings v. Exeter-West Greenwich Regional School Dist. Comm.,* 116 R.I. 90, 352 A.2d 634, 638–40 (1976).

In response to this ruling, the state legislature imposed the additional limitation that "a town shall not be required to transport any pupil beyond an area having a (fifteen) 15 mile radius from the school building which such pupil attends." The federal district court, however, held that this amended law violated the Establishment Clause. *Members of the Jamestown School Comm. v. Schmidt,* 427 F.Supp. 1338 (D.R.I.1977) (*Jamestown I*). The court found, first, that the law "does not in practice, as its purports to, provide transportation benefits to public and sectarian school children alike." *Id.* at 1343. Because transportation must be provided for most public school children (aside from vocational and special education students) "only within the local school districts", the court concluded that the primary beneficiaries of the law were children "attending private schools, the vast majority of which are sectarian." *Id.* Therefore, the law as applied provided "an additional option to children attending out-of-district non-public (i.e., sectarian) schools". *Id.* at 1347. The court also found that the statute would impermissibly entangle church and state in two ways, by increasing the amount of administrative coordination necessary to plan transportation routes, and by exacerbating political fragmentation along religious lines. *Id.* at 1349. There was no appeal from this decision.

Finally, in 1977, the state legislature enacted the busing provisions challenged here, R.I.Gen.Laws §§ 16–21.1–1, –2 & –3. The statute divides the state into five regions, and requires each local school committee to provide a resident student, whether attending a public or private school, with "bus transportation to the school or facility which the pupil attends", as long as the school is "within the region in which the pupil resides." § 16–21.1–2. The law also has a variance procedure which allows a public or private student to attend a school outside of the *region* in which the student resides if the Commissioner of Education "finds that there is no similar school within the region, that such transportation is necessary to provide an educational opportunity which the pupil has a right to pursue, and that the school building which the pupil attends is within fifteen (15) miles of the city or town of which the pupil is a resident." § 16–21.1–3. While these provisions appear neutral, a public student may "*attend* a public school . . . outside of [his] city or town" *only* if the local school committee finds that such school "provides a program or curriculum not available within" the local school district, as authorized by R.I.Gen.Laws § 16–3.1–1 ("Cooperative Service Among School Districts"). § 16–21.1–1 (emphasis added). No similar re-

quirement is imposed on private students. The same criteria of remoteness, however, apply to public and private students alike in determining their eligibility for busing in the first place—that is, all students, public and sectarian, are eligible for busing only if they "live at such distances from the schools which they attend as to make it impractical or hazardous to require [them] to walk to school." § 16–21.1–1.

Plaintiffs in August 1977 initiated the present lawsuit in federal district court. Before deciding the federal constitutional issues raised, the district court certified several issues of state law to the Rhode Island Supreme Court. That court upheld the statute against the state constitutional challenges, ruling that the use of public funds to transport private school students was a proper means of "secur[ing] to the people the advantages and opportunities of education", R.I.Const. Art. XII, § 1, and that, unlike the law invalidated in *Jennings,* the present law was not an unconstitutional delegation of legislative power because it established "five school districts [i.e., regions] and a variance procedure [which] has · carefully circumscribed the interest that private schools may have in expanding for purposes of transportation." *Members of the Jamestown School Comm. v. Schmidt,* R.I. 405 A.2d 16, 23–24 (1979) (*Jamestown II*).

Reaching the merits of the federal constitutional question, the district court in *Jamestown III* found the law "essentially indistinguishable" from the statute invalidated in *Jamestown I* and therefore held that it violated the Establishment Clause. 525 F.Supp. at 1048–49. Specifically, the court concluded that the statute unconstitutionally gave sectarian school children "greater options at greater public expense than their public school counterparts", *id.* at 1049, and that it had the impermissible effect of transferring a major cost of sectarian school regionalization to the taxpayers of the state. *Id.* at 1051. The court also found that the statute fostered excessive government entanglement with religion. First, it entailed "significant administrative interaction between public school and sec-

tarian school officials" in connection with the busing program. *Id.* Second, it required the state Commissioner of Education to determine whether a sectarian school was "regionalized" and whether a sectarian school located outside a transportation region was "similar" to a sectarian school within the region. *Id.* Finally, the court noted that public school budgets have been "pared to the limit", *id.,* and that the statute carried the potential, already realized in part, for political fragmentation along religious lines. *Id.* at 1052. The court stayed its decision pending appeal, however, finding that "a refusal to grant a stay will cause serious, irreparable harm to a large number of nonpublic school children" and that its decision on the merits was "not free from doubt."

With regard to the variance provision for busing beyond the five transportation regions, we agree with district court's entanglement analysis and affirm. As to the rest of its holding, we reverse.

## II. *The Relevant Authorities*

■ In analyzing the validity of the statute under the Establishment Clause, the district court applied the familiar three-part test. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; and third, the law must not foster an excessive government entanglement with religion or excessive political divisiveness along religious lines. *Jamestown III, supra,* 525 F.Supp. at 1049; *see, e.g., Committee for Public Education and Religious Liberty v. Regan,* 444 U.S. 646, 653, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980); *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

■ On the first prong of the three-part test, appellees strenuously argue that the lengthy and intricate history of antecedent legislative efforts to provide busing to sectarian students shows an impermissible purpose in the present law's enactment to "supply financial support to non-public sectarian schools". The district court, however,

found "no support in the record for such an assertion". *Jamestown III, supra,* 525 F.Supp. at 1049. Given the deference accorded to such a finding of the district court, we cannot say that it is unsupported, and, given the Supreme Court's evident willingness to accept a stated secular purpose in school aid cases at essentially face value,[2] we find no basis on which to disturb the district court's finding. Section 16–21.-1–1 recites a number of purposes, among them "to protect the health, safety and welfare of pupils who live at such distances from the schools which they attend as to make it impractical or hazardous to require the pupil to walk to school." Under the leading Supreme Court case in this area, this is a constitutional secular purpose. *Everson v. Board of Education,* 330 U.S. 1, 7, 67 S.Ct. 504, 507, 91 L.Ed. 711 (1947).

On the second prong of the three-part test, the district court held that inter-district transportation options must be equally available to all to pass constitutional muster. If unequal inter-district busing were a matter of first impression, we might well agree. First, a requirement of equal availability effectively ensures that a religious majority will not grant itself special bene-

fits at general expense in the guise of general programs, and, by removing the temptation for illicit legislative attempts, minimizes the prospects of recurrent political strife along religious lines that such attempts are likely to breed.

Second, although school district lines have no magic Establishment Clause significance in themselves,[3] they are not wholly irrelevant either. As the Supreme Court has recognized in another context, district lines reflect a strongly felt need in our society for local control of decisions vitally affecting the education of our children, *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 49–51, 93 S.Ct. 1278, 1305–06, 36 L.Ed.2d 16 (1973), and the local district remains the unit by which school transportation in Rhode Island is financed. At a time when school budgets have been pared to the limit, *Jamestown III, supra,* 525 F.Supp. at 1051, taxpayers of a town at one end of a transportation region might predictably feel less than fairly treated if they must pay to transport sectarian students across town lines to the opposite end of the region just because those students prefer the distant school. Such resentment is especially likely if public school programs

---

**2.** *See, e.g., Wolman v. Walter,* 433 U.S. 229, 236, 97 S.Ct. 2593, 2599, 53 L.Ed.2d 714 (1977) (though loan of instructional materials and equipment was invalid under the effect prong of the three-part test, Court had "no difficulty" in finding a "legitimate interest in protecting the health of [the states] youth and in providing a fertile educational environment") (one-paragraph discussion); *Meek v. Pittenger,* 421 U.S. 349, 363, 95 S.Ct. 1753, 1762, 44 L.Ed.2d 217 (1975) (though direct loan of instructional materials to secular schools was unconstitutional under the effect test, Court "accept[ed]" without further analysis the secular legitimacy of the act's stated purpose of assuring school children "ample opportunities to develop their intellectual capacities"), (one-paragraph discussion); *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973) (though tuition grants, tuition tax credits and direct grants to secular schools for maintenance and repairs were invalid under the effect test, Court found it necessary to "touch only briefly on the requirement of a 'secular legislative purpose' ", since "the recitation of legislative purposes appended to New York's law" included "legitimate nonsectarian state interests" in preserv-

ing a healthy and safe educational environment for school children and promoting pluralism and diversity among public and nonpublic schools) (one-paragraph discussion); *Lemon v. Kurtzman, supra,* 403 U.S. at 613, 91 S.Ct. at 2111 (though Rhode Island teacher salary supplements and Pennsylvania salary, textbook and instructional material grants were invalid under the entanglement prong, "the statutes ... clearly state that they are intended to enhance the quality of the secular education in all schools covered by the compulsory attendance laws" and "[t]here is no reason to believe the legislatures meant anything else") (one-paragraph discussion). On the Court's treatment of the secular purpose test generally, *see* L. Tribe, *American Constitutional Law* 836–37, nn. 7 & 10, and authorities cited thereat.

**3.** In this we agree with Judge Newman's conclusion in *Cromwell Property Owners Ass'n v. Toffolon,* 495 F.Supp. 915, 921 (D.Conn.1979), that "[d]istrict lines are not, in and of themselves, constitutionally significant". We disagree, however, with his apparent conclusion that they have no Establishment Clause importance at all.

must be cut to cover the cost of that busing. If nothing else, inter-district busing thus presents a greater threat of political divisiveness along religious lines than intra-district busing.

Finally, the district court's approach provides a clear and workable test in an area where the lines of separation between church and state are, perhaps inevitably, blurred and indistinct. *See Lemon v. Kurtzman, supra,* 403 U.S. at 614, 91 S.Ct. at 2112. Such a requirement also avoids entangling the courts more deeply in difficult and politically sensitive determinations of the permissible degree of inequality—determinations for which we lack clear Supreme Court guidance, and which courts as institutions seem ill suited to make. Unlike the approach in employment discrimination cases, we should not like to contemplate undertaking to determine whether a given inter-district busing plan was pretextual or not. Nor does it seem to us realistic to inquire whether free transportation is a sine qua non or but-for cause of a sectarian school's survival.

While the Supreme Court upheld the basic constitutionality of state busing of sectarian students some 35 years ago in *Everson v. Board of Education, supra, Everson* alone would prove no barrier to the district court's approach. Though it is evident from the opinions and record that *Everson* involved some inter- as well as intra-district busing, and that parochial students, at least on the elementary level, had greater inter-district options than public school students, we could reasonably view this discrepancy as de minimis. Because the respondent school board in *Everson* maintained no schools beyond the eighth grade, the board reimbursed all high school students, public and private, for the cost of public transit to the nearby cities of Trenton and Pennington. The board also paid the fares of five parochial elementary students in the district. *See Everson v. Board of Education, supra,* 330 U.S. at 30 & n. 7, 67 S.Ct. at 518 & n. 7 (Rutledge, J., dissenting); *Everson v. Board of Education,* 133 N.J.L. 350, 351, 44 A.2d 333, 335 (1945). Those five accounted for less than two percent of the reimburse-

ments to parents in one semiannual payment. In that same period, 21 parochial students were bused in all, and they accounted for less than five percent of the reimbursements as a whole—$357.74 of $8,034.95. *See Everson v. Board of Education,* 133 N.J.L. at 22–23, 44 A.2d at 335.

We do not, however, write on a blank slate. *Everson* does not stand alone. We are constrained by our discipline, which in this case compels us to accord critical weight to several summary decisions of the Supreme Court. More specifically, we are persuaded that the district court's insistence on strict equality is foreclosed by the Supreme Court's recent decisions in *Springfield School District v. Pennsylvania Department of Education,* 483 Pa. 539, 397 A.2d 1154, *appeal dismissed for want of a substantial federal question sub nom. School District of Pittsburgh v. Pennsylvania Department of Education,* 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979); *Pequea Valley School District v. Pennsylvania Department of Education,* 483 Pa. 539, 397 A.2d 1154, *appeal dismissed for want of a substantial federal question,* 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979); and *McKeesport Area School District v. Pennsylvania Department of Education,* 38 Pa. Commw. 290, 392 A.2d 912 (1978), *appeal dismissed for want of a substantial federal question,* 446 U.S. 970, 100 S.Ct. 2953, 64 L.Ed.2d 831 (1980).

At issue in *Springfield, Pequea,* and *McKeesport* was a Pennsylvania statute providing for transportation of pupils to schools up to 10 miles beyond district lines. Since public school pupils in Pennsylvania, as in Rhode Island, must ordinarily attend schools in their home districts, the principal beneficiaries of inter-district busing were sectarian students. As here, the districts in *McKeesport* and *Springfield* argued that the scheme unconstitutionally gave sectarian students a special benefit unavailable to public students generally, in violation of the Establishment Clause:

"A statutory requirement to provide [inter-district] transportation [to parochial

students] where no similar transportation is provided to regular public school pupils raises a substantial Establishment Clause question.

. . . .

. . . . If the Act is permitted to stand, pupils attending nonprofit sectarian schools in Pennsylvania will receive greater benefits in the form of free transportation services than their public school counterparts." *McKeesport* Jurisdictional Statement 9, 12; *Springfield* Jurisdictional Statement 9, 13.

In *Pequea*, a companion case to *Springfield*, the district asserted that "[t]he precise issues addressed by the federal district court[ ] in *Schmidt* [*Jamestown I*] are present in the instant appeal", and argued that the inequalities in the act rendered it invalid on equal protection grounds:

"[The Act] does not afford equal benefits to . public and nonpublic pupils alike. Without applying for and receiving special dispensation, a public school student living in one school district can not, under the Pennsylvania School Code, attend a public school located in another district. Consequently, the transportation of public school pupils by their respective districts is confined to bussing [sic] said pupils to schools located within the district boundaries. The option of being transported outside the district is not, from a practical standpoint, available to public school pupils even though [the Act] does not by its terms prohibit such action. Other rules and regulations restricting attendance of public school pupils to schools located within the district serve to prevent the extra-district bussing [sic] of said pupils. Nonpublic school pupils, on the other hand, have the option of being

4. The Supreme Court itself has conceded that its summary dispositions are often "somewhat opaque". *Gibson v. Berryhill*, 411 U.S. 564, 576, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973).

5. Given the size of the school districts involved, the distances implicated by Rhode Island's transportation regions are comparable to those implicated in the Pennsylvania cases. *See, e.g., McKeesport* Jurisdictional Statement app. D at 7a (district measuring 18.7 miles by 14.8 miles;

transported outside district lines up to a distance of ten (10) miles . . . ." *Pequea* Jurisdictional Statement 12.

In each case, the Court dismissed the appeals for want of a substantial federal question.

While the precise meaning of summary decisions such as *Springfield, Pequea,* and *McKeesport* is necessarily uncertain, *see* R. Stern & E. Gressman, *Supreme Court Practice* 330–36 (1978) *and authorities cited therein,*[4] they remain decisions on the merits, binding on the lower courts at least as to the "specific challenges presented in the statement of jurisdiction". *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (per curiam). Whatever our personal views of the wisdom of the district court's approach, we are constrained to conclude that its requirement of strict equality of eligibility for inter-district busing—and with it, appellees' contentions on this issue—must fail. Although the Rhode Island and Pennsylvania statutes differ in certain particulars—Pennsylvania, for instance, restricts inter-district busing by means of a mile limit to schools ten miles beyond district lines, whereas Rhode Island relies in the first instance on geographical "transportation regions" to fix the outer limit of such busing—the differences are simply not of constitutional dimension.[5] So long as public and sectarian children are bused to *their own schools,* and the same standard of remoteness applies to public and sectarian students alike, the fact that public students are ordinarily ineligible for busing to schools beyond district lines does not render § 16–21.1–1 invalid under the Establishment Clause or the Equal Protection Clause.[6]

inter-district busing of more than 55 miles round-trip possible).

6. We do not fault the district court for overlooking the Supreme Court's summary decisions in *Springfield, Pequea,* and *McKeesport.* Neither party mentioned *McKeesport* below or on appeal, and while both parties discussed the Pennsylvania Supreme Court's opinion in *Springfield* and *Pequea,* neither party mentioned the U.S. Supreme Court jurisdictional

■ Nor is it constitutionally significant, in itself, that Rhode Island sectarian students are bused over special routes rather than established public school routes. If sectarian students can constitutionally be bused to schools beyond public school district lines, they must necessarily be bused on other than established public school routes. Although the *Everson* Court said it went to the "verge" in upholding a statute that provided for busing over established routes, later cases have refused to limit busing schemes to such routes. *See McKeesport, supra; Springfield, supra; Pequea, supra; Snyder v. Town of Newtown,* 147 Conn. 374, 377–79, 161 A.2d 770, 772–73, *appeal dismissed for want of a substantial federal question,* 365 U.S. 299, 81 S.Ct. 692, 5 L.Ed.2d 688 (1961).

At the same time, our approval of §§ 16–21.1–1, –2 and –3 is limited. As the Supreme Court itself has cautioned, summary decisions such as *Springfield, Pequea,* and *McKeesport* "should not be understood as breaking new ground" or as overruling past precedents, "but as applying principles established by prior decisions". *Mandel v. Bradley, supra,* 432 U.S. at 176, 97 S.Ct. at 2240. In those prior decisions, the Court has referred uniformly to the constitutionality of transporting sectarian students as part of a "general" program "neutrally" provided "in common" to "all" school children. *Wolman v. Walter,* 433 U.S. 229, 253, 97 S.Ct. 2593, 2608, 53 L.Ed.2d 714 (1977) (Establishment Clause not offended where a "municipal common carrier is ordered to carry *all* school children at a reduced rate, or where the police force is ordered to protect *all* children on their way to and from school") (emphasis added); *Roemer v. Board of Public Works,* 426 U.S. 736, 746–47, 96 S.Ct. 2337, 2344–45, 49 L.Ed.2d 179 (1976) (opinion of Blackmun, J., joined by Burger, C.J., and Powell, J.) (religious institutions "need not be quarantined from public benefits that are *neutrally* available to *all* ") (emphasis added); *Meek v. Pittenger,* 421 U.S. 349, 364, 95 S.Ct. 1753, 1763, 44 L.Ed.2d 217 (1975) (State may, "as part of

*general* legislation made available to *all* students, . . . include church-related schools in programs providing bus transportation") (emphasis added); *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 781–82 & n. 38, 93 S.Ct. 2955, 2969–70 & n. 38, 37 L.Ed.2d 948 (1973) (busing in *Everson,* whose "class of beneficiaries included *all* school children", public as well as private, was analogous to services such as police and fire protection, which was provided *"in common* to *all* citizens") (emphasis added); *Lemon v. Kurtzman, supra,* 403 U.S. at 616–17, 91 S.Ct. at 2113 (Establishment Clause permits bus transportation "supplied *in common* to *all* students") (emphasis added); *Everson v. Board of Education, supra,* 330 U.S. at 17, 67 S.Ct. at 512 (state may constitutionally "spend[ ] tax-raised funds to pay the bus fares of parochial school pupils as part of a *general* program under which it pays for fares of pupils attending public and other schools") (emphasis added).

■ While the Court's "common to all" language is at first blush difficult to square with the inequalities upheld in *Springfield, Pequea,* and *McKeesport,* we must reconcile the authorities as best we can. We do not read the "common to all" language to require absolute equality of access or expenditure, either statewide, taking the busing program as a whole, or district-by-district in each of the program's inter- and intra-district parts. We do, however, read this language to limit the degree of disparity the Constitution will permit. Whether busing is within a district or across district lines, public and parochial students must be eligible for busing to *their* schools on the same terms: if distance is the criterion and sectarian students living a certain distance from their school are eligible for busing at public expense, public students living the same distance from their school must likewise be eligible.

Just as important, the relative costs per-student of sectarian and public student busing must remain roughly proportional. We agree with Judge Newman's observation in

statements in those cases and their controlling precedential significance.

*Cromwell Property Owners Ass'n v. Toffolon, supra,* 495 F.Supp. at 923, that "[a]t some point, the cost of inter-district transportation for students attending sectarian schools may become so grossly disproportionate compared to the ordinary expense of public school busing that the 'indirect' benefits in regionalization accruing to sectarian institutions will rise to a constitutionally significant level" and have as their primary effect the advancement of religion. We agree also with the Pennsylvania Supreme Court that constitutional limits are exceeded "if the cost of transportation for the students attending sectarian schools [is] so disproportionate that it bec[o]me[s] apparent that the transportation provided to the public school youngster [is] merely a ruse to confer a benefit to the sectarian school pupil." *Springfield School District v. Pennsylvania Department of Education, supra,* 483 Pa. at 558 n. 9, 397 A.2d at 1164 n. 9. To these observations we add that inordinately long-distance busing calls into question the secular health, safety and welfare purposes cited in busing's support, for at some point, the increased hazards of travel over increasing distances and for increasing times may outweigh the benefits of the bus. Expenditures may also become so grossly disproportionate as to breed political divisiveness along religious lines.

Short of these limits, we intimate no views. Nor do we suggest a fixed proportion or a dollar or mile limit.[7] The balance is as much qualitative as quantitative, and will depend on the facts and circumstances of the case. But where a forbidden purpose or an impermissible primary effect is indicated, or where palpable disparity has bred significant divisiveness along religious lines, we are persuaded that a busing program will have ceased to be a "general" program of secular benefits neutrally available to all, and will have crossed the line from providing a "remote and incidental" benefit to offering a "direct and immediate" benefit to religion.[8]

 Applying these principles to the instant case, we cannot say, at least on the present record, that Rhode Island has yet crossed that line. The district court found that inter-district busing of sectarian students was more expensive than intra-district busing of regular public students, and that the statute had "the effect *in fact* of transferring a major cost of regionalization" from sectarian schools and sectarian students' parents to the taxpayers of Rhode Island. *Jamestown III, supra,* 525 F.Supp. at 1051. Because the evidence on cost was incomplete, however, and the method of calculation unexplained, the district court made no finding as to the precise difference in cost between public and sectarian student busing. Since the Supreme Court's decisions permit some inequality, the district court's general finding of disparity is insufficient for us to hold the statute invalid on the present record on grounds of cost. We also question the propriety of comparing intra-district busing of public students with inter-district busing of sectarian students: if sectarian students may constitutionally be bused at public expense to their

---

7. We have been urged, in the event that we could not uphold the entire statutory scheme, to validate the challenged program but require that per pupil transportation expenditures not exceed those for public students. Although an appropriations ceiling of this sort and the sort contained in the statute upheld in *Cromwell Property Owners Ass'n v. Toffolon, supra,* may be wise, such a ceiling is not required by the Constitution, and the enactment of one is a matter for the state legislatures and not the federal courts. As the Supreme Court wrote in *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 761 & n. 5, 93 S.Ct. 2955, 2959 & n. 5, 37 L.Ed.2d 948 (1973), "it is evident from the numerous opinions of the Court, and of Justices in concurrence and dissent in the leading cases applying the Establishment Clause, that no 'bright line' guidance is afforded." *See also Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952) ("The problem, like many problems in constitutional law, is one of degree.").

8. Nothing in our opinion today should be read to permit a "heckler's veto" over busing programs. As we observed recently in *Donnelly v. Lynch,* 691 F.2d 1029, 1035 (1st Cir.1982), no program has ever been held invalid on political divisiveness grounds *alone.* To render cost differences constitutionally significant, there must not only be divisiveness; the objective disparity must also be palpable.

schools, wherever located, the relevant comparison would seem to be between the relative costs per student of public and sectarian busing *as a whole.*[9]

Without precise figures on the relevant costs, the effect of the statute on the regionalization of sectarian schools is conjectural. There was no evidence that any church school was built or regionalized to take advantage of the law, or that transportation region lines were gerrymandered to give a hidden subsidy to existing church schools. Moreover, the current law does not permit church schools to expand indefinitely the area from which they will accept students. A sectarian school may if it wishes enroll students from all five transportation regions, but under the current law, it cannot, absent special circumstances, require the public to pay for the transportation of students from outside the one region in which it is located—a region fixed by law and which the school is powerless to expand.

Should evils of the sort outlined above materialize, appellees are, of course, free to return to the district court to seek additional relief. We hold here only that on the present record, and under the controlling Supreme Court authorities, the district court's conclusion that the Rhode Island law has the primary effect of advancing religion must fall.[10]

### III. *The Entanglement Problem of § 16–21.1–3*

The district court also found that the statute created an excessive entanglement of church and state in several ways. First, the court noted that the statute necessitated a substantial increase in the number of administrative contacts between public and sectarian school officials in order to coordinate the details of the transportation program. *Jamestown III,* 525 F.Supp. at 1051. Second, the court emphasized the unacceptable risk of "political fragmentation and division along religious lines", *id., quoting Meek v. Pittenger,* 421 U.S. at 372, 95 S.Ct. at 1766, caused by public opposition to inter-district busing for private students. Finally, the court held that the statute on its face created excessive entanglement, by requiring the Commissioner of Education to determine whether a particular sectarian school is "regionalized", and to determine whether it is "similar" to another school for the purpose of granting a transportation variance. *Id.*

■ The record does not persuade us that the increase in administrative contacts is as yet a problem of constitutional magnitude. The district court found that the statute entailed "significant interaction be-

---

9. We do not include here the cost of inter-district public busing of vocational and special education students, but only public students in the regular curriculum. To this day, special education students are bused under a wholly separate statute from the one under consideration here, R.I.Gen.Laws § 16–24–4, as originally were vocational students. *See Jamestown I, supra,* 427 F.Supp. at 1343. In addition, the old vocational education provision established not five but nine schools and, in effect, nine transportation regions for vocational students. While vocational students at those nine schools are now bused under the same statute as sectarian students, it is clear from its origin that vocational education stands on a different footing from the general curriculum, and is not an appropriate element in the relevant comparison of costs.

We note also that the figures before the district court showed disparities in some districts far greater than the statewide averages. *See Jamestown III, supra,* 525 F.Supp. at 1050 ($84.27 per student per year to bus public

school students within Warwick, versus $121.83 for inter-district busing of Warwick students to one sectarian school and $1,436.28 per student per year to another sectarian school). Whether or not such disparities may render the law invalid as applied in one district but not others is a question we do not reach here.

10. The district court also found evidence of divisiveness along religious lines, but this divisiveness, even if properly denominated "political", was unrelated to any differences in the cost of busing. We are persuaded also that the small difference in cost relied on by the district court ($108 per student per year statewide for inter-district busing of sectarian students versus $100 for intra-district busing of public students) would not justify our drawing an inference of impermissible legislative purpose, particularly when the cost difference between public and sectarian student busing as a whole is likely to be even smaller.

tween public school and sectarian school officials in order to provide for proper scheduling and routing of buses, necessary adjustment for holidays or special events, and so forth", and "to deal with discipline problems". *Id.* at 1049. We are not persuaded, however, that these contacts, standing alone, invalidate the program. Unlike teacher salaries or direct grants, which can be diverted to direct sectarian purposes, busing is by nature a "secular, neutral, [and] non-ideological service[ ]". *Lemon v. Kurtzman, supra,* 403 U.S. at 616–17, 91 S.Ct. at 2113. Consequently, it involves neither forbidden state intrusion into religious matters, nor "comprehensive, discriminating, and continuing state surveillance" to ensure its confinement to secular use. *Id.* at 619, 91 S.Ct. at 2114. Rather, the contacts are ministerial or mechanical in nature, and concern administrative, not religious, matters. Comparable contacts are intrinsic to virtually all busing programs, and appellees have not shown that the contacts at issue here are different in kind or degree from the contacts implicitly upheld by the Supreme Court in busing cases from *Everson* to *Springfield* and explicitly approved in *Wolman v. Walter, supra. See generally Springfield School District v. Pennsylvania Department of Education, supra,* 483 Pa. at 563–66, 397 A.2d at 1166–68 for a good discussion of this issue. Nor, without more, do we believe that the Commissioner's determination of whether a school is "regionalized" entails excessive and impermissible entanglement of government and religion. That determination would seem to be a simple factual question, not requiring any assessment or comparison of religious curricula.

Likewise, the record does not persuade us that the risk of political division is as yet a problem of constitutional magnitude. The record for the most part shows only specific complaints over the mechanics of busing's administration. In one instance, Catholic parents objected to having their elementary school children bused with older high school students, who were from the public school. Complaints like this, however, are not properly "political" and were only incidentally along religious lines. They do not signal the sort of divisiveness with which the cases are concerned, for the Establishment Clause is not concerned with divisiveness generally, but only *political* divisiveness *along religious lines.* In the instance cited above, the parents complained as parents, not as Catholics, and their complaint concerned the public students' age, not their religion.

We are more troubled by the appearance of a large number of Catholic parents and parochial school officials at a school committee meeting in Newport to object to a proposal to eliminate busing altogether. Controversies of this sort more properly pose a risk of constitutionally significant division along religious lines, for in such a case, parochial school parents have a special political interest *as parochial school parents*—i.e., as Catholics—wholly apart from their status as taxpayers or parents generally. Because it was isolated, we cannot say that this single incident renders the Rhode Island law invalid. *See Donnelly v. Lynch,* 691 F.2d 1029, 1035 (1st Cir.1982). It is, however, a warning signal.[11] We agree with the district court, moreover, that § 16–21.1–3 is facially invalid for the following reason.

---

**11.** While scholars have criticized the political divisiveness test's pedigree and compatibility with representative democracy, *see, e.g.,* Gaffney, *Political Divisiveness Along Religious Lines: The Entanglement of the Court in Sloppy History and Bad Public Policy,* 24 St. Louis U.L.J. 205 (1980), the Supreme Court has adhered to the test, most recently in *Larson v. Valente,* 456 U.S. 228, 251–253, 102 S.Ct. 1673, 1687, 72 L.Ed.2d 33, 50 U.S.L.W. 4411, 4417–18 (1982), where the Court struck down a Minnesota charitable solicitation statute on Establishment Clause grounds. Whether or not political divisiveness is a useful test generally, we are persuaded that it is an appropriate check here, where a single religious faith may claim as adherents a majority of the population of the state. This is not to say, of course, that such a group will necessarily abuse its position; only that, given the potential for abuse, checks are appropriate.

In deciding whether or not to grant a variance to allow a private student to be bused outside of the transportation region, the state Commissioner of Education must determine whether the sectarian school that the student wishes to attend is "similar" to a school located within the region. See R.I.Gen.Laws § 16–21.1–3. If the provision were limited to comparison on secular factors such as the availability of a certain sports or language program, it would raise no entanglement concerns. Testimony before the district court, however, indicated that there are no standards to guide the Commissioner's assessment of similarity, and that religion is a primary aspect of the curricula to be compared. If the Commissioner does his job, he will be required to examine the content and curricula of religious programs in order to determine whether they are similar. We are troubled by the possibility that the Commissioner would have to engage in educational and perhaps even theological hair-splitting to compare sectarian schools, especially where the schools may represent competing orders or approaches of a single faith. "This kind of state . . . evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids." Lemon v. Kurtzman, 403 U.S. at 620, 91 S.Ct. at 2115; see L. Tribe, American Constitutional Law § 14–12, at 869 (1978). Moreover, even such seemingly secular items as library or drama program equality may pose religious issues, for one man's masterpiece may be another's heresy.

█ Although the variance provision is invalid, we are persuaded that it is severable from the other portions of the statute. Under the general rules concerning severability, the otherwise valid portion of a statute can stand if it is fully operative and there is no showing that the legislature would not have enacted the valid provisions independently. United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). See also Chartier Real Estate Co. v. Chafee, 101 R.I. 544, 225 A.2d 766 (1967) (remainder need not fall where voided section is not indispensable to the other parts of the act). Here, the variance provision

was a minor part of the statutory scheme applicable to a relatively small number of students. In view of the legislature's overriding concern with the health and safety of school children, we are persuaded that it would have enacted the other provisions on busing independently. In any event, there has been no showing to the contrary.

We therefore affirm the judgment of the district court insofar as it declared the variance provision of R.I.Gen.Laws § 16–21.1–3 invalid as infringing the Establishment Clause of the First Amendment. As to the rest of the district court's judgment we reverse. Although this is a close case, we conclude that the district court's insistence on equal access to inter-district busing cannot stand in the face of the controlling Supreme Court precedents.

*Affirmed in part, reversed in part.*

BREYER, Circuit Judge (concurring).

After considerable debate and reflection all members of this panel have agreed that (with one minor exception) the Rhode Island statute is constitutional. The careful and conscientious opinion of the majority reflects the fact that we have all found this a difficult case. Given the difficulty and the work and thought that the majority's opinion reflects, I am tempted to join it. But I do not do so because there remains a disagreement that I believe is significant. In essence, the majority holds that, while it is technically bound by a minor precedent to reverse, the law, in logic and spirit, really runs to the contrary. Indeed, the majority writes that, were it not for the letter of this unargued Supreme Court case, namely, *Springfield School District v. Department of Education,* 483 Pa. 539, 397 A.2d 1154, *appeal dismissed for want of a substantial federal question sub nom. School District of Pittsburgh v. Department of Education,* 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979), it would affirm the decision of the district court. *Members of the Jamestown School Committee v. Schmidt,* 525 F.Supp. 1045 (D.R.I.1981). But, I do not agree that this panel's result rests upon so slender a precedential reed. Moreover, I believe the Establishment Clause calls for a more

"practical" approach to this type of problem than the comparatively "theoretical" approach taken by the district court and the majority of this panel. Since the court's opinion invites reconsideration of *Springfield,* it seems appropriate to explain why I believe the district court is wrong in holding the Rhode Island statute unconstitutional.

The Supreme Court in *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) specifically held that the Establishment Clause of the United States Constitution does *not* forbid a state ("as a part of a general program," *id.* at 17, 67 S.Ct. at 512) to pay for transporting school children to Catholic, as well as to public, schools. The Court reasoned that a law that provides for transporting school children is a law that promotes "the welfare of the general public," *id.* at 14, 67 S.Ct. at 511, much like a law that provides "ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks," *id.* at 17–18, 67 S.Ct. at 512. As such, the Court held that it was not the type of law "which is designed to support institutions which teach religion." *Id.* at 14, 67 S.Ct. at 511. This principle is clearly enunciated in *Everson.* It has been clearly applied in many later cases (*see, e.g., Cromwell Property Owners Association, Inc. v. Toffolon,* 495 F.Supp. 915 (D.Conn.1979) (very similar issue to that in case at bar); *Bennett v. Kline,* 486 F.Supp. 36 (E.D.Pa.) (same), *aff'd,* 633 F.2d 209 (3d Cir.1980) (without published opinion); *Snyder v. Town of Newton,* 147 Conn. 374, 377–79, 161 A.2d 770, 772–73 (constitutionality of busing upheld even though transportation to private schools created "some additional expense to the town") *appeal dismissed for want of a substantial federal question,* 365 U.S. 299, 81 S.Ct. 692, 5 L.Ed.2d 688 (1961); *West Morris Regional Board of Education v. Sills,* 58 N.J. 464, 279 A.2d 609 (busing within specified cost limit for students to private schools up to twenty miles away upheld), *cert. denied,* 404 U.S. 986, 92 S.Ct. 450, 30 L.Ed.2d 370 (1971); *Springfield School District v. Department of Education, supra; Rhoades v. Abington Township School District,* 424 Pa. 202, 220, 226 A.2d 53, 64 (1967) (constitutionality of busing for private school children upheld even if parochial schools receive indirect financial benefit from busing), *appeal dismissed for want of a substantial federal question,* 389 U.S. 11, 88 S.Ct. 61, 19 L.Ed.2d 7 (1967); *State ex rel. Hughes v. Board of Education,* 154 W.Va. 107, 174 S.E.2d 711 (1970), *appeal dismissed and cert. denied,* 403 U.S. 944, 91 S.Ct. 2274, 29 L.Ed.2d 854 (1971)). In my view the district court's decision is wrong, not simply because it conflicts with the disposition of the *Springfield* case, but because it is inconsistent with several aspects of this more firmly established principle.

First, the record does not reveal any significant favoritism of "religions as against nonbelievers" in theory or in practice. *Torcaso v. Watkins,* 367 U.S. 488, 495, 81 S.Ct. 1680, 1683, 6 L.Ed.2d 982 (1961). The district court found a *theoretical* favoritism (presumably sufficient to warrant a finding of unconstitutionality, *see, e.g., Wolman v. Walter,* 433 U.S. 229, 254, 97 S.Ct. 2593, 2608, 53 L.Ed.2d 714 (1977) (field trip program held unconstitutional because of "unacceptable risk of fostering of religion")) in the fact that Catholic school students have a greater right to transportation outside "school districts" than do public school students. But this fact is irrelevant for the purposes of finding a *theoretical* favoritism, for the "school districts" that the court discussed are *public* school districts, the boundaries of which were drawn with *public* schools rather than parochial schools in mind. It is hardly surprising that each Catholic school is not located in the center of each *public* school district. A program that seeks approximately equal or even absolutely identical treatment for Catholic and public school students will likely transport some Catholic school students across public school district boundaries. Presumably, some public school students will be taken across Catholic school boundaries (if such boundaries exist) as well. It is simply not possible for a *theoretical* inequality to arise only from the fact that busing will take some private school students across public school boundaries.

The matter would have been very different had the district court found, as a *practi-*

*cal* instead of a *theoretical* matter, that Catholic schools obtain a disproportionate benefit because they serve students from regions that are significantly larger than the local school districts. But the record suggests the contrary. The defendants offered evidence which suggests that no matter how the problem is viewed, the Catholic schools receive no practical advantage. According to this data, in 1978–1979 the state transported nearly 90,000 public school students and about 8,300 religious school students. It apparently paid over $10 million for public school transportation, but merely a little more than $850,000 for religious school transportation. In fact, if one focuses only upon students who were bused outside of their local *public* school districts, one finds that more *public* school students were bused (2,864) than religious school students (1,154). And (perhaps because many public school students transported across district lines were handicapped children) the total inter-district public school transportation bill was $2 million while inter-district parochial school busing cost less than $125,000.

The most relevant figure, however, is the transportation cost per pupil. The defendant's figures suggest that the cost per pupil for transportation *within public* school districts was $100 per public school student and $102 per parochial school student; the cost per pupil for transportation *outside* the public school districts was $108 per parochial school student but $702 per public school student (perhaps reflecting the cost of busing handicapped students). Taking all (inter- and intra-district) transportation costs together, the state's costs amounted to about $120 per public school pupil and $103 per religious school pupil.

These figures are not inherently implausible. In fact, they are fully consistent with the hypothesis that Catholic students live, on average, a bit further from their schools than public school students. After all, in a small state like Rhode Island per pupil transport costs may be more a function of the extent to which an individual bus is filled with students than of the distance traveled.

The district court did not "accord these figures great weight," primarily because the "survey provide[d] no information as to how the reported costs were calculated." *Members of the Jamestown School Committee v. Schmidt,* 525 F.Supp. at 1050. The court also noted that in some areas a school had to pay much more for transporting students to a particular Catholic school than to a public school. But the district court did not decide this case on the ground of practical advantage or significant difference in transport costs. To the contrary, it apparently accepted the defendant's figures *arguendo,* and held that, while it was somewhat more expensive to bus religious school students outside public school districts than to bus public school students within public school districts, how much this difference might be was "unimportant." *Id.* at 1051.

The statewide dollar differences in per pupil expenditures of the sort introduced in this case, however, could not support a conclusion that this law, as a practical matter, impermissibly favors Catholic schools over public schools. The differences are *de minimis.* It would be impossible for a state to create a system guaranteed to produce absolute equality of costs. Indeed, the state's figures could reflect far greater disparities before they came close to the type of favoritism that has been held to cause a constitutional problem. *See, e.g., Springfield School District v. Department of Education,* 483 Pa. at 558 n. 9, 397 A.2d at 1164 n. 9 ("A constitutional consideration would arise only if the cost of transportation for the students attending sectarian schools was so disproportionate that it became apparent that the transportation provided to the public school youngster was merely a ruse to confer a benefit to the sectarian school pupil."); *Bennett v. Kline,* 486 F.Supp. at 39 (adopting *Springfield* rationale); *Cromwell Property Owners Association, Inc. v. Toffolon,* 495 F.Supp. at 923 ("At some point, the cost of inter-district transportation for students attending sectarian schools may become so grossly disproportionate compared to the ordinary expense of public school busing that the 'indirect' benefits in regionalization accruing to sectarian institutions will rise to a constitutionally significant level."). The cost differentials in isolated

cases, while possibly relevant, prove little in and of themselves, for in other isolated instances public school busing is presumably more expensive than private. The issue at stake is the effect of the plan as a whole; police protection does not become unconstitutional because in one precinct it is unusually expensive to protect a church, nor fire protection because in one neighborhood the church alone is made of wood. The district court's uncertainty about comparative costs would warrant at the most further factual development were the matter more questionable.

Second, the transportation statute is neutral on its face. It divides the state into regions and provides that:

A pupil attending a school, including a public school, vocational school, special education program ..., a consolidated school ..., a regional school ..., or a non-public non-profit school ... shall be provided with bus transportation to the school or facility which the pupil attends, within the region in which the pupil resides ....

R.I.Gen.Laws § 16–21.1–2 (1981). Can a court find this statute unconstitutional simply because it can find another statute (setting up public school districts) which, in combination with the transportation statute, creates what it (wrongly, in my view) conceives as a *theoretical* advantage for Catholics? Does a fire department violate the Establishment Clause if it buys equipment tall enough to reach a church dome if zoning laws make the equipment unnecessary for other buildings? If so, and more important for purposes of this case, does the Establishment Clause strike down general laws that would authorize such expenditures *even if in fact the dome is no higher than other buildings?* My point is that, if the Establishment Clause strikes down such an "expenditure" law, it must do so because *in fact* the law will lead to disproportionately large expenditures favoring religious institutions, not because there is a theoretical possibility it could do so at some other time or in some other place.

Third, there are other practical considerations. As long as *Everson* is the law, proportionate state expenditure on school transportation is support for child safety rather than support for the church. *See Everson v. Board of Education,* 330 U.S. at 18, 67 S.Ct. at 512. If so, there ought to be a feasible way for a state to do what it has a right to do—namely, to draft a statute that pays for transportation proportionately. Rhode Island's experience thus far suggests that this is easier said than done. And, one might test the more "theoretical" approach by asking what, if this statute were unconstitutional, the legislature here *ought* to have done? Should it have confined Rhode Island's Catholic school students to public school districts, even though many districts contain no Catholic schools? Should it have bused a student to the border of such a district, where the child can walk across the boundary and board the next district's bus? Should it have provided that Catholic students can be bused only to those Catholic schools that happen to be located in the *middle* of a public school district? Should it have said that school children who attend a Catholic school that happens to be located on the boundary between public school districts A and B can be bused if they live in A, but not B; or that they can be bused if they live in either district but must travel on separate (and hence more expensive) buses so that neither bus crosses the district line? The fact that it is difficult to think of a statute that would satisfy the approach of the district court and the fact that plausible statutory solutions seem arbitrary or only tangentially related to any serious Establishment Clause objective suggest that the more "theoretical" approach is wrong. If *Everson* is right, there should be a way to apply it in Rhode Island.

Fourth, I am concerned, here as elsewhere, about the practice of combining several different statutes to find in the combination a theoretical preference, which is then held unconstitutional. In *Usher v. Schweiker,* 666 F.2d 652, 661–62 (1st Cir. 1981), we pointed out that the Equal Protection Clause does not automatically invalidate a statute simply because that statute can be combined with another to produce a result that seems unfair or even irrational. Rather, given the vast number of laws,

rules and regulations, any absolute "rational total net result" requirement, as applied to possible combinations of different laws, is unworkable and would make legislating too difficult. The same is true here. It is easy to think of laws that might combine with transportation, police or fire protection statutes to produce theoretical advantages for religious institutions. A state law may end the public school day at 4:00 p.m., giving Catholic school students the theoretical right to take buses at different (and more expensive) times. A state law may place public schools in safer areas of the city, making police protection for private religious schools potentially more costly. A state law may require public schools to be built of fire-proof material, making fire protection for religious schools potentially more expensive. The problems engendered by combining different statutes and then asking whether, in theory, the combination gives Catholic students something their public school counterparts are denied are not ones that rise in this case to a constitutional level. The ease with which statutes can be combined to produce possible differences suggests that a court should examine the significance of these differences *in practice.*

For these reasons, unlike the majority of this panel, I do not find it surprising that the Supreme Court dismissed *Springfield* for want of a substantial federal question. Nor am I surprised that other cases have followed *Springfield. See e.g., Cromwell Property Owners Association, Inc. v. Toffolon, supra; Bennett v. Kline, supra.* Indeed, Justice Black in *Everson* noted that the state could have required "a local transit company to provide reduced fares to school children including those attending parochial schools, or . . . a municipally owned transportation system [could have] undertake[n] to carry all school children free of charge." These schemes would have been fully as constitutional as the plan the state did adopt, he explained, for the denial of such services was "obviously not the purpose of the First Amendment." *Everson v. Board of Education,* 330 U.S. at 17–18, 67 S.Ct. at 513; *see Wolman v. Walter,* 433 U.S. at 253, 97 S.Ct. at 2608 (reaffirming

validity of illustration). Yet, the Justice made no calculation of per pupil costs, and mentioned no maps of school district lines—even though local trolley lines rarely pay heed to school district boundaries. The First Amendment, after all, is impartial. It plays no favorites between public and private school students, and that impartiality implies that it not penalize parochial school students on the basis of public school district lines. It is possible for expenditures for a neutral purpose like school transport to be weighted too heavily in favor of religious school students and thus to offend the Constitution. However, the question of constitutionality in such a case is primarily a question of practical effect, measured in terms of costs incurred by the state and actual benefit conferred on the parochial school student. No unconstitutional practical effect has been demonstrated here. For this reason, and not simply because of the Supreme Court's dismissal of the *Springfield* case, I agree with the court's result.

I also agree that § 16–21.1–3 (providing for busing to a school outside a student's region where "there is no similar school within the region") is unconstitutional. In giving the Rhode Island commissioner of education the authority to examine the religious content of a private school's curriculum and then to make judgments about the propriety of busing based on that examination, the section entangles church and state in a manner that the Establishment Clause was designed to prevent.

The Supreme Court has severely limited a court's power to intervene in religious disputes, even to decide property matters. *See Presbyterian Church in the United States v. Mary Elizabeth Blue Hill Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (courts may not consider theological issues when resolving property disputes between religious bodies). *See* Freund, *Public Aid to Parochial Schools,* 82 Harv.L.Rev. 1680 (1969). Of course the "wall between church and state," *Everson v. Board of Education,* 330 U.S. at 18, 67 S.Ct. at 513, is not absolute. A state may, for instance, inspect religious schools to see that they meet the state's educational standards. *See Board of Education v. Al-*

*len,* 392 U.S. 236, 246 n. 7, 88 S.Ct. 1923, 1928 n. 7, 20 L.Ed.2d 1060 (1968). Similarly, it may provide textbooks to religious school students, despite the consequent risks of entanglement. *See id.* at 244–45, 88 S.Ct. at 1927; *Wolman v. Walter,* 433 U.S. at 236–38, 97 S.Ct. at 2599–2600; *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975). *See generally* Freund, *supra.* Yet, it is difficult in this case to find any strong educational or other reason to have the state's commissioner of education examine the theological orientation of one religious school to determine whether a student is entitled to inter-regional busing to attend another. The Rhode Island legislature should be able to redraft this severable section to limit inter-regional busing in a less intrusive way.